Filed 5/21/14 Unmodified opinion attached

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,                                    )
                                               )
      Plaintiff and Respondent,    )
                                               )        S059912
      v.                              )
                                               )
JOSEPH MANUEL MONTES,                          )
                                               )       Riverside County
      Defendant and Appellant.      )   Super. Ct. No. CR 58553
_____)

## ORDER MODIFYING OPINION AND
## DENYING PETITION FOR REHEARING

THE COURT:

The opinion herein, published at 58 Cal.4th 809, is modified as follows:

In the paragraph beginning on page 887 of the published opinion, and ending on page 888, all text after the first sentence is deleted. The remaining sentence of this paragraph, followed by citations as indicated hereafter, is combined with the ensuing paragraph of the opinion, also modified as indicated below. The last two paragraphs on page 888 remain as originally written.

The modified passage is thus amended to read: Defendant contends the prosecutor committed misconduct by violating his discovery obligation to disclose the letter to the defense if he intended to use it as rebuttal evidence at the penalty phase. (See, e.g., *People v. Gonzalez* (2006) 38 Cal.4th 932, 955-960.) However, assuming for the sake of argument the prosecutor erred by not disclosing the letter,

we find the error harmless beyond a reasonable doubt because the prosecutor withdrew his use of the letter and the trial court admonished the jury.  Under these circumstances, there can have arisen no reversible impact on the defense's ability to make informed tactical decisions about which witnesses to call (see *ibid.*; *People v. Pinholster* (1992) 1 Cal.4th 865, 941); it is as though the letter never existed as an undisclosed obstacle to the presentation of mitigating testimony by defendant's wife.

This modification does not change the judgment.

The petition for rehearing is denied.

Filed 3/13/14

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,               )
                                )
       Plaintiff and Respondent,   )
                                )        S059912
          v.                 )
                                )
JOSEPH MONTES,           )
                                )      Riverside County
       Defendant and Appellant.   )   Super. Ct. No. CR-58553
_____)

A Riverside County jury found defendant Joseph Montes guilty of first degree murder (Pen. Code, §§ 187, 189) (count I)),[1] kidnapping during the commission of a carjacking (§ 209.5) (count II), carjacking (§ 215) (count III), and being a felon in possession of a firearm (former § 12021, subd. (a)(1), now § 29800, subd. (a)) (count IV). The jury found true three special circumstance allegations, namely, that the murder was committed while defendant was engaged in the commission of a (1) robbery, (2) kidnapping for robbery, and (3) kidnapping. (§ 190.2, former subd. (a)(17)(i) & (ii), now subd. (a)(17(A) & (B).) The jury also found true the enhancement allegations that a principal was armed with a firearm in the commission of the murder, the kidnapping during the commission of a carjacking, and the carjacking (§ 12022, subd. (a)(1)). After the

---

[1]     Statutory references are to the Penal Code unless otherwise noted.

penalty phase, the jury returned a verdict of death. The trial court denied defendant's motions for new trial (§ 1181) and modification of the penalty (§ 190.4, subd. (e)), and sentenced him to death. This appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).) We reverse count III and stay the sentence for count II, but affirm the judgment in all other respects, including the death sentence.

## INTRODUCTION

Responding to a call reporting gunshots in a remote part of Corona, police discovered the body of 16-year-old Mark Walker in the open trunk of his car. Walker had been shot five times at close range. The prosecution's theory was that Walker had been robbed, carjacked, and kidnapped by defendant, by two of his codefendants at trial, Ashley Gallegos and Travis Hawkins, and by Miguel Garcia, who was a juvenile at the time of the murder.[2] Apparently, the foursome carjacked and kidnapped Walker because they needed a ride to a birthday party for codefendant Salvador Varela. They shoved Walker into his trunk and drove Walker's car to the party in Corona, where they stayed briefly. With Walker still in the trunk, they drove Walker's car to a nearby isolated location, while Varela followed in his van. Once there, a member of the group shot Walker as he tried to get out of the trunk. The group abandoned Walker's car, and Varela drove them back to the party. Several prosecution witnesses, including Varela's brother

---

[2] Garcia was not identified by name until halfway through the trial, and was not apprehended until the beginning of defendant's penalty phase. The record does not disclose whether Garcia was prosecuted for the crimes against Walker.

George, his sister Sylvia, and his girlfriend Kimberly Speck, testified that defendant admitted he shot Walker.[3]

Defendant, Gallegos, Hawkins, and Varela were tried together, although a separate jury sat for Varela because his admissions to police implicated the other defendants' confrontation rights under *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*) and *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*). The prosecution sought the death penalty only against defendant.

### I. FACTS

#### A. Guilt Phase

##### 1. The Prosecution's Case

###### a. The Day of the Murder

On Saturday, August 27, 1994,[4] 16-year-old Mark Walker was living in Banning with his mother and stepfather. At approximately 5:30 p.m., he asked his mother whether he could go shopping at the mall; she agreed and gave him two $100 bills, which he put in his dark wallet. Walker said he planned to be out most of the evening, visiting friends and listening to a band. His mother told him to be home by 11:00 p.m. or to call if he planned to stay with a friend. At about 6:30 p.m., Walker left in the family car, a gray Buick Regal. Neither his mother nor the friends he planned to visit ever heard from him again.

At dusk, Nathan Hanvey went to Jay's Market in Beaumont. Hanvey attended high school with Walker and knew him as an acquaintance. He saw Walker waiting in line to buy a soda, and they briefly discussed a local football

---

[3]     Codefendant Salvador Varela and his siblings share the same last name. To simplify our discussion of the facts and the law, we refer to codefendant Salvador Varela as Varela, and refer to his siblings by first name.
[4]     All further calendar dates refer to 1994 unless otherwise noted.

game.  Hanvey noticed Walker's dark wallet and saw that it contained a substantial amount of money.  Hanvey also noticed five or six "scary looking" Hispanic men waiting in line.  Hanvey recognized one of them, Travis Hawkins, and said hello, but he did not know the others.  After Walker bought his soda, he left the store; the Hispanic group bought a six-pack of beer and also left.  At trial, Hanvey identified defendant, Hawkins, and Gallegos as part of the group at the market.

Salvador Varela lived in an apartment in Corona with his sister Sylvia, his brother George, and George's girlfriend, Marci Blancarte.  Between 3:00 and 5:00 a.m. on the day of the murder, defendant, Gallegos, and two or three others dropped by the Varela apartment and spoke with George.  Gallegos showed George a black handgun, which George offered to buy, but Gallegos declined to sell.  George invited defendant and Gallegos to Varela's birthday party that evening.

During the afternoon, defendant had repeatedly called the Varela apartment seeking a ride to the party from his Beaumont home for himself and Gallegos.  George declined to pick them up because it was too far away.  Sylvia called Gallegos that afternoon to offer him a ride, but Gallegos indicated he already had one.

Defendant arrived at the party before sunset while Sylvia and other guests were standing on the balcony.  The group saw defendant drive up in the Buick.  Defendant was accompanied by Gallegos, Hawkins, and Garcia.  From the balcony, Arthur Arroyo saw Gallegos bend as he stepped from the front passenger side of the Buick as if he were retrieving something, possibly a gun, which he tucked in his shirt.  Another guest, Kevin Fleming, watched the Buick park and saw the four male passengers enter the apartment.  Hawkins joined a conversation with Fleming and the Varela brothers, telling them he had been in a convenience

4

store where he could have "smoked" (shot) a clerk who gave him attitude about his clothing.

Within 10 minutes after he arrived, defendant asked George to help him drop off the Buick, which he claimed belonged to a friend. George refused, suspecting the car was stolen. Defendant then turned to Varela for assistance with the car. Varela initially refused, claiming he had had too much alcohol, but eventually agreed. His girlfriend, Kimberly Speck, had hidden his car keys, but relinquished them when Varela insisted he needed them to do a favor for defendant. Varela promised to return soon. Fleming and another guest, Christopher Eismann, offered to drive Varela, but he refused, saying he was "only going around the corner." Varela left in his van with Gallegos. Defendant, Hawkins, and Garcia left in the Buick.[5]

Around 8:00 p.m. that night, Alexander Silver was in the backyard of his Corona house, talking with his sister, Laura Esqueda. The house, which overlooked Palisades Road, was about three miles from the Varela residence. Silver and Esqueda heard four gunshots. Looking toward Palisades Road, they saw a van parked on the shoulder of the road, facing east, and a car next to the van, facing west. The head and tail lights of the van and the car illuminated the scene. Silver saw three Hispanic men standing near the open trunk of the Buick, one of whom may have extended an arm for an instant. Silver ran inside and called the police, but Esqueda, now joined by her husband, continued to watch. Esqueda saw three males run around the van to the passenger side. Her husband saw two people standing behind the Buick; he watched as they were joined by a

---

[5] Fleming testified Hawkins stayed at the party and played dominoes or cards. Sylvia testified she did not see Hawkins leave in either vehicle.

5

third person who approached from the driver's side of the van. The vehicle lights went off, and the couple saw no further movement.

Fifteen to 30 minutes after the five men had left Varela's party, they returned in Varela's van. The Buick did not return. Most of the group stood together, talking on the balcony. Witnesses gave varying accounts of the group's mood after they returned. Fleming testified their demeanor had not changed. Sylvia testified Gallegos and Varela seemed very subdued. Speck testified Varela was pale, worried, and in a panic.

Defendant offered to buy pizza for the party, and asked George for change for a $100 bill. Blancarte saw defendant take $20 bills from a dark wallet to pay for the food.

Many partygoers saw firearms on display that night. Early in the evening, defendant showed Arroyo and others a nickel-plated revolver. Blancarte saw a large black handgun passed around the balcony and later noticed defendant showing a small handgun to two people in the bathroom. Around midnight, Varela and George showed Arroyo a nine-millimeter handgun that had been concealed under the bathroom sink.

Between 10:00 p.m. and midnight, a group that included defendant, Varela, George, Fleming, Hawkins, and Gallegos went to a nearby pool hall. While there, defendant and Hawkins got into an argument. Hawkins removed a small derringer from his pocket, but George told him to put it away. The group later returned to the party, which eventually wound down.

### b. The Day After the Party

On Sunday morning, George left the party after 1:30 a.m. with a female companion and spent the night in Long Beach. Around 1:30 or 2:00 a.m., defendant's cousin, Eddie Montes, drove Hawkins and Garcia to Beaumont.

6

Defendant and Gallegos stayed at the Varela apartment all night. Sylvia testified that she, defendant, and Gallegos smoked methamphetamine together and played video games.

Later that morning, Varela and Speck went to a donut shop and bought a newspaper that contained an article about the dead body of a man found in the trunk of a car off Palisades Drive.[6] Back at the apartment, Speck showed the article to defendant and Gallegos. Defendant reacted by denying he committed the crime, telling Speck, "Can you believe that they're trying to pin this on me," and "They're trying to say that was me that killed that kid."[7] Later, however, defendant showed the article to Sylvia and bragged, "I did this," and told her not to tell anyone. Defendant made a number of telephone calls, including one to his father in which he admitted responsibility for the killing. During the call, defendant argued with his father; after the call, he said he would have to go a few "rounds" with his father. Sylvia and Blancarte both testified they heard defendant say he had earned "his stripes" for the killing; Speck heard defendant say something about earning a stripe or a medal on his uniform.

George returned to the Varela apartment that afternoon and agreed to drive defendant and Gallegos to Beaumont. On the way, defendant removed a

---

[6] The article from the August 28, 1994 edition of the Riverside Press-Enterprise, read as follows: "The body of a man who had been shot to death was found inside the trunk of a car parked along a Corona road yesterday, police said. The man, whose identity was unknown last night, was found about 9 p.m. in the area of Green River Drive and Palisades Drive. Officers found the man in the open trunk of a Buick Regal while responding to the report of shots heard in the area, police Lt. Henry Aja said. The man was shot at least once in the upper torso, Aja said. Police had not made any arrests in connection with the death last night."

[7] At trial Speck testified defendant used the word "guy" rather than "kid." In an earlier out-of-court statement to Varela's investigator, Speck said defendant used the word "kid" to describe the victim.

newspaper clipping from his pocket and told George an "old man" from Beaumont had been killed. Defendant said he committed the crime. He described the shooting. He added that he had pulled his sleeve down to protect his hands from blood spatter, and he pointed to what he said was a blood spot on his sleeve. He said that, after firing one or two shots, he had looked away as he continued to fire because he was "grossed out" by the sight. Defendant also said he had "jacked" the car, and that the gun was gone. George did not believe the story.

In Beaumont, George dropped off Gallegos and then drove to defendant's house. When he parked, George saw his best friend, Victor Dominguez, standing in his yard not far from the Montes residence.[8] Dominquez came up to the car and told George "You're riding around with a 187."[9] George, defendant, and Dominguez then went into defendant's house. Defendant's father was in the living room and looked angry. Defendant told them, "I had to do it. I ain't gonna let four vatos go down for some white boy." George and Dominguez then left to go to Dominguez's house. As they walked alongside the Montes house, they saw the police arrive to arrest defendant.[10]

---

[8]    Victor Dominguez was a cousin of defendant and codefendant Hawkins.
[9]    Presumably, this was a reference to section 187, the California murder statute. As discussed, *post* at pages 62-65, the trial court admitted this statement for the nonhearsay purpose of showing George's state of mind.
[10]    In his testimony, Dominguez denied seeing defendant or George that day. Dominguez also denied having regular contact with George in 1994, although his telephone number appeared on George's telephone bill many times in July, August, and September. One of the officers who arrested defendant testified he recognized Dominguez as being in the street a couple of houses down at the time of the arrest.

### c. The Criminal Investigation

By the time officers arrived at Palisades Road in response to the "shots fired" call, the van was gone, but the Buick was there with its trunk open and its trunk light on. In the trunk, the officers found Walker's body on its back with one leg outside the car.

About 9:00 p.m. Detective Ronald Anderson joined the officers who had arrived a half hour earlier. The detective discovered tire tracks in a circular pattern across the dirt median. An identification technician collected physical evidence, including tire impressions. The tire impressions matched the type of tires on Varela's van. The technician also collected two spent nine-millimeter cartridge casings from the trunk and two from the ground behind the Buick. He lifted two latent fingerprints, one from the hood and one from the glass on the driver's side window.

On Sunday morning, the identification technician provided the latent print cards to the sheriff's department fingerprint identification section. Around noon, Detective Anderson was notified the fingerprint from the driver's side window matched that of defendant. At approximately 6:00 p.m., the police arrested defendant. They arrested Salvador Varela, Gallegos, and Hawkins between August 29 and September 2.

Dr. Joseph H. Choi determined Walker had been shot at close range five times, each within a few seconds of the others. Walker was shot on the top of his head, in the right side of his mouth, and in the left side of his face. The wounds indicated that all five shots came from the same direction. Walker was alive when the shots were fired, but died within minutes.

Several months after the murder, a jogger found a nine-millimeter chrome Glock pistol about a mile from the murder scene. Subsequent testing determined the gun was most likely the murder weapon. It was registered to Steven Glomb,

9

whose teenage daughter knew Gallegos and Garcia's brother Refugio.[11] Glomb identified the Glock as one of two guns stolen from his collection in 1994; the other was a Walther PPK/S .380. In late August, Gallegos, Refugio, and others visited Glomb's daughter. Refugio testified he and Gallegos took the two guns. Gallegos kept the Glock, and Refugio kept the .380.

Refugio testified Gallegos later came to his apartment to borrow the .380. Gallegos told him he was going to a party in Corona and wanted to have the gun in case he got jumped. Gallegos stuck the gun in his pants and then got into the front passenger seat of a gray car. A few days later, Gallegos returned the .380 and told Refugio they had carjacked and killed someone, taken $200 from "the kid," and thrown away the nine-millimeter gun. Gallegos told Refugio they had not used the .380, but advised Refugio to get rid of it.

### d. Gang Evidence

Police Sergeant Scott Beard testified as an expert on gangs in Beaumont. He said two Hispanic gangs were active in the city at the time of the murder, Varrio Beaumonte Rifa (VBR) and Northside Beaumont. Hawkins and Garcia were VBR members. Gallegos was a VBR associate. Defendant, Varela, and George were not known to be VBR members. Defendant had gang tattoos, but none for VBR.[12] Sergeant Beard testified a person can get "jumped" into a gang by committing a crime.

### 2. The Defense Case

Neither defendant nor his codefendants testified. Defendant called three witnesses. Jason Gogolin testified George and another man were involved in an

---

[11] Because Miguel Garcia and his brother share the same last name, we refer to Miguel Garcia's brother as Refugio.
[12] Defendant's gang tattoos are described, *post*, at page 56.

assault at an apartment unrelated to the capital crime.[13]  Russell Rigsby, a friend of the victim, testified he saw Walker on the day of the murder around dusk at a gas station in the town next to Beaumont.  It was stipulated that an investigator for the prosecution had interviewed Rigsby prior to trial, and that Rigsby had stated that Walker mentioned he either had beer or was going to buy some beer.  Detective Anderson testified that, during his initial interview with Speck, she had only discussed Varela's coming and going from the party and had not mentioned defendant or any of the codefendants.[14]

## B.  Penalty Phase

### 1. Prosecution Evidence

The prosecutor presented evidence that defendant previously had been convicted of felony burglary and had used his own waist chains to strike codefendant Gallegos while the two were in a holding cell along with other inmates.  The prosecutor also introduced evidence that defendant possessed deadly weapons in jail while awaiting trial.  Defendant had been discovered in his cell holding a toothbrush with a razorblade on the end, and a "shank" (a broken piece of plastic with a handle) was found in another search of his one-man cell.

Mark Walker's family members described him as a responsible young man and a caring son and brother.  They described the devastating impact his murder had on his family and friends.

---

[13]     This testimony was offered to impeach George's testimony as a prior crime bearing on his character as a witness.
[14]     Defendant's theory was that Speck's testimony about defendant's involvement in the crime was the result of her later collaboration with the Varela brothers and other prosecution witnesses.

11

The prosecutor showed the jury a 10-minute video tape composed of 115 photographs of Walker; it was accompanied by light instrumental music. The video concluded with an image of a snow-covered road and a photograph of Walker's memorial bench at the cemetery, which his high school football team had donated. Walker's mother described her distress at discovering that the bench and Walker's gravestone were later vandalized.

### 2. *Defense Evidence*

Defendant presented the testimony of his mother, various relatives, and former teachers about his childhood and developmental disabilities. Defendant was hyperactive as a child and had difficulties in public and parochial school, where he was considered "slow." Defendant's parents divorced when he was in the sixth grade. His mother developed a drinking problem thereafter, and, in her brother's opinion, she neglected her children. Defendant lived with his grandfather off and on and then went to live with his father.

Childhood testing indicated defendant had an I.Q. of 68 to 70. A subsequent test administered while he was awaiting trial showed an I.Q. of 77, with a possible range of 72 to 82. The clinical psychologist who administered the test testified this was at the 6th percentile for the general population and fell within the borderline mentally retarded range.

To explain his possession of weapons in jail, defendant presented evidence that he had been the victim of a stabbing in jail.

### 3. *Prosecution Rebuttal*

In rebuttal, the prosecutor presented evidence that, sometime in 1994, the police had discovered defendant in possession of an altered Philips-head screwdriver. Defendant had not been arrested on that occasion.

12

## II. PRETRIAL ISSUES

### A. Denial of Discovery Motion Based on Discriminatory Prosecution

Defendant brought a motion to compel discovery of information from the Riverside County District Attorney Office (the District Attorney) concerning its charging of death penalty cases. He based his motion on the claim that the District Attorney had decided to prosecute him because of the race of the victim. Defendant contended the selective charging constituted a discriminatory prosecution in violation of equal protection. The trial court denied the motion. On appeal, defendant contends the trial court erred in denying his discovery motion, and he raises the underlying constitutional defense that the prosecutor engaged in discriminatory prosecution. We conclude defendant failed to make a showing sufficient to entitle him to discovery on the issue of discriminatory prosecution and has failed to establish a defense of discriminatory prosecution.

#### 1. Background

Pursuant to *Murgia v. Municipal Court* (1975) 15 Cal.3d 286 (*Murgia*), defendant filed a series of pretrial motions to obtain discovery of material concerning the District Attorney's death-penalty charging practices. He sought materials regarding each homicide case prosecuted by the office since 1978 in which special circumstances were alleged and the death penalty sought, along with homicide cases in which life in prison without parole was sought, and information about homicide cases in which special circumstances were not alleged. He also requested discovery of the race and ethnic background of each defendant and victim in these cases.

In support of his claim that the decision to seek the death penalty was a discriminatory prosecution based on the race and status of the victim, defendant cited instances in taped interviews in which investigating officers referred to the

13

victim as "the white kid" and mentioned that the victim's stepfather was a former police officer. Defendant submitted a study indicating that, for the period from 1992 to 1994, 81 percent of capital prosecutions undertaken by the District Attorney involved White victims, while Whites constituted only 39 percent of willful homicide victims in the county in that time period. After briefing and a hearing, the trial court denied the discovery motion, ruling defendant had failed to produce the requisite threshold showing of discriminatory prosecution.

### 2. Analysis

#### a. Discriminatory Prosecution and Related Discovery

"[D]iscriminatory enforcement of the laws may be a valid defense in a case in which the defense can establish deliberate invidious discrimination by prosecutorial authorities." (*Griffin v. Municipal Court* (1977) 20 Cal.3d 300, 306 (*Griffin*).) A prosecutor's discretion to prosecute is constrained by federal principles of equal protection and may not be based on " 'an unjustifiable standard such as race, religion, or other arbitrary classification.' " (*United States v. Armstrong* (1996) 517 U.S. 456, 464 (*Armstrong*), quoting *Oyler v. Boles* (1962) 368 U.S. 448, 456.) In *Murgia*, *supra*, 15 Cal.3d at page 306, we held that when a defendant seeks to defend a criminal prosecution based on discriminatory prosecution, "traditional principles of criminal discovery mandate that defendants be permitted to discover information relevant to such a claim."

At the time of the *Murgia* decision, criminal discovery in California, unlike civil discovery, was "strictly a judicial creation." (*Griffin*, *supra*, 20 Cal.3d at p. 306.) However, in 1990, Proposition 115 was passed, and it included the Criminal Discovery Statute, section 1054 et seq. Section 1054, subdivision (e), states that "no discovery shall occur in criminal cases except as provided by this chapter, other express statutory provisions, or as mandated by the Constitution of the

14

United States." Discovery related to a claim of discriminatory prosecution is not provided for in section 1054.1, which sets forth the prosecutor's discovery obligations, or in any other statute.

Defendant brought his discovery motion related to discriminatory prosecution in 1996. At least one California Court of Appeal opinion has held a *Murgia* discovery motion is constitutionally compelled discovery based on federal equal protection, and thus survives the passage of Proposition 115. (*People v. Superior Court (Baez)* (2000) 79 Cal.App.4th 1177, 1188; see Pipes and Gagen, Cal. Criminal Discovery (4th ed. 2008) §§ 6:5-6:7, pp. 730-732 [citing California appellate opinions assuming a federal constitutional basis for *Murgia* discovery motions].) In *Armstrong*, the United States Supreme Court assumed discovery based on a defense of discriminatory prosecution was available to a criminal defendant defending against a federal charge in federal district court. (*Armstrong*, *supra*, 517 U.S. at p. 463.) The majority opinion held such discovery was not based on Federal Rules of Criminal Procedure, rule 16 (18 U.S.C.) and left open the question of whether this discovery was constitutionally based or was based on a federal district court's inherent discovery powers. (*Armstrong*, at p. 463; see *id.* at p. 477 (dis. opn. of Stevens, J.).)

Here, we shall assume for the sake of argument that defendant's *Murgia* discovery motion was validly made. We therefore turn to the question of whether defendant made the requisite showing under state or federal standards to obtain the discovery he sought through the motion.

Under our state law standard, a *Murgia* motion must " 'describe the requested information with at least some degree of specificity and must be sustained by plausible justification.' " (*Griffin*, *supra*, 20 Cal.3d at p. 306, quoting *Ballard v. Superior Court* (1966) 64 Cal.2d 159, 167.) We have held a showing of "plausible justification" requires a defendant to "show by direct or circumstantial evidence

15

that prosecutorial discretion was exercised with *intentional and invidious discrimination in his case*." (*People v. Keenan* (1988) 46 Cal.3d 478, 506.) Similarly, under the federal standard, a defendant must produce "some evidence" tending to show the existence of both a discriminatory effect and the prosecutor's discriminatory intent. (*Armstrong*, *supra*, 517 U.S. at p. 468.)

### b. Defendant's Showing

Because a state that bases enforcement of its criminal laws on an unjustifiable standard such as race would violate the equal protection clause, a defendant has standing to contend he has been discriminated against on the basis of his purported victim's race. (*McCleskey v. Kemp* (1986) 481 U.S. 279, 291-292, fn. 8 (*McCleskey*).) Here, defendant contends the prosecutor discriminated in bringing a capital prosecution against him because the victim was White.

Defendant additionally contends he was subject to discriminatory prosecution because the victim was related to members of law enforcement. He points to a taped interview between codefendant Gallegos, police detectives, and the deputy district attorney, in which an interviewer mentioned that the victim's stepfather was a former police officer and that his brothers were police officers. However, defendant fails to provide authority that this type of victim status constitutes an unjustifiable or arbitrary classification under federal equal protection.[15] We therefore reject defendant's arguments based on this aspect of the victim's status.

---

[15] Defendant cites the high court's statement that our system of justice does not tolerate distinctions based on the perceived worthiness of the victims. (*Booth v. Maryland* (1986) 482 U.S. 496, 506, fn. 8., overruled in part in *Payne v. Tennessee* (1991) 501 U.S. 808, 830 (*Payne*).) But this language refers only to the Maryland state law the *Booth* court found unconstitutional for allowing a jury at the sentencing phase to consider the background of the victims and whether they were "assets to their community." (*Booth*, at p. 506, fn. 8.)

With regard to his claim of discriminatory prosecution based on the race of the victim, defendant points to three items he presented in support of his discovery motions on the issue: (1) a statistical summary of death penalty prosecutions in Riverside County; (2) his expert's declaration on the significance of this and other statistical reports on capital prosecutions; and (3) the use of racial terms by investigating officers and the deputy district attorney in interviews with suspects in the case. We discuss each below.

### 1. *The Statistical Report and Expert Declaration*

To support his claim that the District Attorney invidiously discriminated against murderers of White people in bringing capital prosecutions, defendant submitted a statistical report indicating that 81 percent of capital prosecutions undertaken by the District Attorney from 1992 to 1994 involved White victims, whereas Whites constituted only 39 percent of the "willful" homicide victims in Riverside County during that period.

As the prosecutor noted, defendant's report was a bare statistical comparison of the race of homicide victims in Riverside County without consideration of individual case characteristics. Significantly, the study did not indicate what percentage of the non-White-victim homicides would have been eligible to be charged as capital homicides. The expert's accompanying declaration contained a summary of studies purporting to demonstrate statistical discrepancies in the charging of the death penalty based on the race of the defendant and the victim based on data collected mainly from jurisdictions in southern states. The declaration did not appreciably strengthen defendant's showing beyond what he presented through the Riverside statistical study.

Defendant contends his statistical report was adequate to meet his burden for obtaining discovery, which was to offer some evidence of both discriminatory

17

effect and discriminatory intent. He cites a Ninth Circuit opinion stating that "[t]he Supreme Court has not determined whether statistics relating exclusively to the prosecuting authority are sufficient, standing alone, to establish a prima facie claim of discriminatory intent in a capital charging case." (*Belmontes v. Brown* (9th Cir 2005) 414 F.3d 1094, 1128.) We need not decide this issue because defendant's statistical report was fundamentally flawed and failed to show discriminatory effect, let alone discriminatory intent. Defendant attempts to distinguish his statistical study from the one rejected by the United States Supreme Court in *McCleskey*. In *McCleskey*, *supra*, 481 U.S. at page 292, the high court rejected the argument that the defendant's statistical study (the "Baldus study") was sufficient to establish the existence of discriminatory intent for the Georgia capital cases the report analyzed. Defendant contends his study is distinguishable from the Baldus study because it focused on racial disparity in the *charging* authority (the District Attorney) rather than on racial disparity in *sentencing* (which extends to every actor in the process, including the jury). However, as discussed above, defendant's study failed to take into account the case characteristics of the homicides, which is a crucial factor for a district attorney's capital charging decisions. We conclude that whatever benefit defendant's study gained by focusing on the charging authority was negated by the failure to address the homicide case characteristics.

## 2. *Use of Racial Terms*

In support of his claim that the use of racial terms provided evidence of discriminatory intent, defendant points to the following instances in which the prosecutor and investigating officers used racial terms in their interviews with the codefendant and other individuals in the case:

18

(1)  Juan Santana lived below the Varela brothers and was arrested based on statements made by defendant.  In an interview conducted in Spanish through an interpreter, an investigating officer urged Santana to confirm or deny whether he was present in the victim's car the night of the killing because, as the officer contended, defendant and Varela, being "home boys," were likely to blame Santana because he was a "wet back."

(2)  The interrogating officers used the term "White boy" in questions to the codefendants, such as "Did you kill the White boy?" and "Were they bragging about ripping off the White boy?"

(3)  At the hearing on the discovery motion, the prosecutor denied defendant's claim that the interrogating officers' use of racial terms indicated racial animus, and noted that race may have played a part in the case to the extent the codefendants may have carjacked the victim because he was young, White, and vulnerable.  In a supplemental motion, defense counsel pointed to this statement as confirming the importance of the race of the victim to the prosecutor.

We find persuasive the prosecutor's responses at the hearing on the discovery motion.  The prosecutor said the use of "wet back" by the interrogating officers was not derogatory in context because it was used by individuals on the street to refer to themselves and by defendant himself during his interview with the police.  As to the use of "White boy," the prosecutor pointed out defendant himself first described the victim as "the White guy" in an interview with police and that the interviewers' use of the term followed from that initial identification.  Finally, we conclude the prosecutor's observation that Walker's race may have been one reason why defendant and his cohorts targeted him for the carjacking was an unobjectionable comment on his view of the case, rather than an admission that he engaged in discriminatory prosecution based on the race of the victim.

We conclude defendant has not shown the prosecutor intentionally discriminated in the exercise of his charging discretion.  Defendant has therefore failed to make the requisite showing of discriminatory prosecution to obtain discovery.  Accordingly, we conclude the trial court did not err by denying the discovery motion under either the *Murgia* or *Armstrong* standard.  In turn, assuming for the sake of argument that defendant is entitled to raise his constitutional defense for the first time on appeal, we conclude defendant failed to show he actually was subjected to a discriminatory prosecution.[16]

## B.  *Pitchess* **Motion**

Seeking information about possible police misconduct to support his discovery motion based on discriminatory prosecution, defendant moved for discovery of the personnel records of three police officers under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.  Judge Ronald L. Taylor performed an in camera review of the records that was transcribed and sealed.  After reviewing the personnel records, he said there were no citizen complaints regarding two of the officers.  The judge then indicated that, while there were some complaints in the third officer's file, the complaints were not discoverable because they did not concern areas in which defendant was seeking discovery.  Defendant has asked us to review what the judge considered to determine whether any records were incorrectly withheld.

We first note that the record in the present case is adequate to permit a meaningful appellate review.  (*People v. Prince* (2007) 40 Cal.4th 1179, 1285.)  It

---

[16]    We note that defendant's claim of discriminatory prosecution based on the status of the victim as a child of law enforcement personnel would, if cognizable, fail on its merits for the same reason as his race-based claim; namely, defendant's failure to produce evidence of discriminatory effect and intent.

includes a full transcript of the in camera hearing in which Judge Taylor stated what documents he examined. No augmentation of the record is necessary. We have reviewed the record and independently conclude Judge Taylor did not abuse his discretion in denying the *Pitchess* motion. (*Prince*, at p. 1286.)

### C. Severance Motions

The trial court denied each of defendant's severance motions. Defendant contends the trial court erred in (1) refusing his request to conduct an in camera review of declarations he submitted under seal in support of his motions; (2) denying his motion to sever his trial from all other codefendants; and (3) denying his alternative motion to sever his trial from that of codefendant Hawkins. We conclude the trial court did not err in its rulings on the severance motions.

#### 1. Denial of In Camera Review of Sealed Declarations

Defendant filed under seal several declarations by defense counsel in support of his severance motions. The first, submitted in support of the motion to sever his case from all codefendants, discussed defense investigation and strategy concerning the codefendants, and it stated counsel's belief that the codefendants would put forth defenses asserting defendant was the shooter. Defendant also submitted two declarations in support of his separate request to sever his trial from codefendant Hawkins. These contended family dynamics were hindering defense counsel's ability to conduct the penalty phase investigation. Defendant and codefendant Hawkins are first cousins; Hawkins's mother is the sister of defendant's father. Defense counsel contended some family members were supporting Hawkins over defendant, and were reluctant to talk to defendant's representatives for fear of harming Hawkins at the joint trial. Defense counsel contended family members would be more willing to talk with defendant's representatives if defendant's trial were severed from that of Hawkins.

21

The prosecutor objected to the trial court's considering any of the sealed declarations, while defendant argued the court should review them in camera. After a hearing on the issue, the trial court sustained the prosecutor's objection. It reasoned that the People's due process rights were implicated in the severance motions, and that, if it were to consider the sealed declarations in camera, the People would have no effective way of representing their substantial interest in the determination of the motions.

Defendant contends the trial court erred in failing to fulfill its obligation to consider all available evidence relevant to the severance motions. He cites two cases in which a trial court accepted in camera offers of proof for severance motions, *People v. Hardy* (1992) 2 Cal.4th 86, 167, and *People v. Odle* (1988) 45 Cal.3d 386, 403, but acknowledges he has found no authority stating that a trial court must do so.

Defendant points to other areas of the law in which trial courts accept in camera offers of proof, such as disputes concerning third party discovery and disputes over claims of privilege. These areas of the law are distinguishable. Discovery from third parties does not implicate a prosecution's interests in as substantial a way as a severance motion. The party invoking a claim of privilege is entitled to in camera review of the relevant proffered evidence because the party seeks to prevent another party from using the alleged privileged material at trial. By contrast, defendant sought to use the material in support of a severance motion but nonetheless shield it from disclosure to the prosecutor based on the work product privilege.

In the absence of any law requiring a trial court to accept an in camera offer of proof for a severance motion, we conclude the trial court's decision to permit or not permit such an offer is within the trial court's discretion. (See *People v. Guerra* (2006) 37 Cal.4th 1067, 1113 [abuse of discretion standard of review

22

applies to any ruling by a trial court on the admissibility of evidence].) We have found no abuse of discretion in the trial court's ruling in this case. Defendant's claim that the trial court was unable to make an informed ruling on the merits of his motions without considering the sealed declarations is belied by the record. At the hearing on the motions, defense counsel discussed the relevant information raised in the sealed declarations. She mentioned possible antagonistic defenses between the codefendants, described how some mutual relatives appeared to be supporting codefendant Hawkins rather than defendant, and noted that some relatives were unwilling to talk to defendant's representatives for fear of harming Hawkins's position at trial. Despite defendant's claim to the contrary, the trial court was not "in the dark" in ruling on the severance motions.

### 2. *Motion to Sever from the Other Codefendants*

Section 1098 expresses a legislative preference for joint trials. A trial court's denial of a motion for severance is judged on the facts as they appeared at the time of the ruling and is reviewed for abuse of discretion. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40-41.) If the ruling was correct when made, we will reverse it only if a defendant shows that joinder actually resulted in "gross unfairness" amounting to a denial of due process. (*People v. Johnson* (1988) 47 Cal.3d 576, 590.) Defendant contends his joint trial resulted in gross unfairness.

Defendant's motion for severance from all codefendants was based on his concerns regarding (1) *Aranda/Bruton* issues (*Aranda*, *supra*, 63 Cal.2d 518 and *Bruton*, *supra*, 391 U.S. 123), (2) irreconcilable defenses, (3) the likelihood his codefendants' attorneys would act as "second prosecutors" and try to shift blame from their clients to defendant; and (4) the fact defendant was the only defendant facing the death penalty. None of these bases required severance of defendant's case from all of his codefendants.

23

The trial court empaneled a separate jury for codefendant Varela because his statements to the police were incriminating to defendant and the other codefendants and were therefore inadmissible at a joint trial. (*Aranda*, *supra*, 63 Cal.2d 518; *Bruton*, *supra*, 391 U.S. 123 (*Aranda/Bruton*).) Because only Varela's jury heard his statements incriminating defendant, the *Aranda/Bruton* concerns raised in defendant's severance motion were addressed.

"[A]ntagonistic defenses do not warrant severance unless the acceptance of one party's defense would preclude acquittal of the other party." (*People v. Lewis* (2008) 43 Cal.4th 415, 461.) Here, none of the codefendants testified or presented evidence at trial attempting to shift the blame to another codefendant, but defendant claims their antagonistic or irreconcilable defenses were reflected in testimony of various *prosecution* witnesses. Defendant contends those witnesses fabricated or skewed their testimony to incriminate defendant in an attempt to exonerate or lessen the culpability of the other codefendants. However, matters of credibility were for the jury to decide. (See *People v. Mayberry* (1975) 15 Cal.3d 143, 150.) We reject defendant's attempt to use his assessments of witness credibility to argue denial of his severance motion led to a gross unfairness in his trial.

To support his claim that his codefendants' attorneys would act as "second prosecutors," defendant points out that counsel for Gallegos successfully moved under Evidence Code section 351 to exclude, as irrelevant, Gallegos's statement made during a police interview that he knew the victim. For the reasons discussed *post* at pages 70-71, we conclude the trial court did not abuse its discretion in granting that motion, and that the exclusion of Gallegos's statement did not render defendant's trial grossly unfair.

24

Finally, "[b]oth this court and the United States Supreme Court have upheld the practice of conducting joint trials of defendants eligible for the death penalty with those who are not." (*People v. Tafoya* (2007) 42 Cal.4th 147, 163-164.)

In light of the above, we find no merit to the claim that the trial court abused its discretion in failing to sever defendant's case from all of his codefendants.

### 3. *Motion to Sever from Codefendant Hawkins*

Defendant alternatively moved for severance from Hawkins, claiming denial of the motion would have an adverse impact on the ability of defendant's counsel to investigate and prepare the penalty phase. He contended his relatives on his father's side of the family, who were related to Hawkins, appeared to be supporting Hawkins in their family feud and were unwilling to be interviewed by defendant's counsel. In renewing this argument on appeal, defendant contends being jointly tried with Hawkins affected his ability to present evidence on his behalf at the guilt and penalty phases.

Neither defendant's father nor anyone from that side of defendant's family testified on defendant's behalf at the guilt or penalty phases, and defendant's father did not testify at the guilt phase in response to George's testimony that defendant admitted he was the killer in front of defendant's father. Defendant points out that, during closing argument at the guilt and penalty phases, the prosecutor mentioned defendant's father did not testify, and then argued the jury could infer from the defense's failure to call him that his testimony would have been adverse to defendant's position. Defendant contends it is "reasonably possible" that if this severance motion had been granted, his father would have presented testimony disputing George's account, and that would have precluded the prosecutor's damaging argument.

25

We reject defendant's claim that denial of a severance motion should be analyzed under the state law standard for errors at the penalty phase, namely, whether there is a "reasonable possibility" the error affected the penalty verdict. (*People v. Brown* (1988) 46 Cal.3d 432, 447.) Instead, defendant must show joinder actually resulted in "gross unfairness," amounting to a denial of due process. (*People v. Johnson*, *supra*, 47 Cal.3d at p. 590.) In any event, defendant merely speculates that his father would have contradicted George's account at a trial had he and Hawkins not been tried together. Equally speculative are defendant's arguments that paternal relatives would have presented unspecified favorable evidence at his penalty phase had his trial been severed from Hawkins's. Defendant fails to show the denial of his severance motion resulted in gross unfairness amounting to a denial of due process. (*Ibid.*)

### D. Failure to Take a Blood Sample

Defendant moved under *California v. Trombetta* (1984) 467 U.S. 479 (*Trombetta*) to dismiss the case, or, in the alternative, to have the trial court give an ameliorative instruction, because the police did not take a blood sample when they arrested him. Here, as he did below, defendant argues a blood sample might have shown a high level of methamphetamine in his system and that such evidence could have been used to mount an affirmative defense of intoxication at the guilt phase or as mitigating evidence at the penalty phase. We conclude that the trial court did not err by denying the motion to dismiss and the request for an ameliorative instruction, and that defendant's due process rights were not violated.

At a hearing on the motion, the two officers who initially arrested defendant testified to the following: They arrested defendant about 6:00 p.m. on August 28, nearly 24 hours from the time the Corona Police Department received the call about a murder in progress. At the time of his arrest, defendant was speaking so

26

quickly Detective Anderson had to tell him to slow down so he could be understood. Detective Stewart testified defendant exhibited symptoms of "hypertension," but Stewart attributed defendant's state to the shock of being caught rather than to drug use. Stewart believed a blood sample could be useful to a defense of intoxication if a person is arrested soon after a crime, but not when, as here, the arrest occurred almost 24 hours later. Karla Sandrin, defendant's trial counsel, provided a sworn declaration that the prosecutor informed her defendant had been "flying" when the prosecutor interviewed him after his arrest. The trial court denied the *Trombetta* motion, ruling the police were under no obligation to collect evidence in the case, and that the testimony revealed the officers did not believe defendant was under the influence of a narcotic at the time of his arrest.

The federal constitutional guarantee of due process imposes a duty on the state to preserve "evidence that might be expected to play a significant role in the suspect's defense." (*Trombetta*, *supra*, 467 U.S. at p. 488.) In other words, that evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Id.*, at p. 489.) Generally, due process does not require the police to collect particular items of evidence. (*People v. Frye* (1998) 18 Cal.4th 894, 943.) "The police cannot be expected to 'gather up everything which might eventually prove useful to the defense.' " (*People v. Hogan* (1982) 31 Cal.3d 815, 851.) A trial court's ruling on a *Trombetta* motion is upheld on appeal if a reviewing court finds substantial evidence supporting the ruling. (*People v. Memro* (1995) 11 Cal.4th 786, 831.)

This is not a case where evidence initially gathered was destroyed. The issue here is the asserted failure of the police to collect relevant exculpatory evidence. Although we have suggested that cases may arise in which the failure to collect

27

evidence could justify sanctions against the prosecution at trial, the failure to collect blood sample from defendant at the time of his arrest but almost 24 hours after the crime is not such a case. (*People v. Frye*, *supra*, 18 Cal.4th at p. 943 [no duty to collect bloody slipper for blood typing].)

In any event, defendant's claim would fail even if *Trombetta* and its progeny apply to a claim of a failure to collect evidence. "*Trombetta* speaks of evidence whose exculpatory value is 'apparent.' " (*Arizona v. Youngblood* (1988) 488 U.S. 51, 56, fn. *.) Here, the testimony indicated the officers did not believe defendant was under the influence of drugs when arrested. The testimony also failed to establish an apparent exculpatory connection between the possible presence of a narcotic in a defendant's blood when he was arrested and his level of intoxication, if any, when the murder was committed nearly 24 hours earlier.

Defendant's failure to show the apparent exculpatory value of a blood sample at the time of his arrest also bears on the issue of whether the police acted in bad faith. "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." (*Arizona v. Youngblood*, *supra*, 488 U.S. at p. 58.) Because "[t]he presence or absence of bad faith by the police . . . must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed" (*Id.* at pp. 56-57, fn. *), defendant has failed to establish bad faith in this case.

We conclude substantial evidence supported the trial court's denial of the *Trombetta* motion.

**E. Stun Belt during Trial**

Over defendant's objections, the trial court ordered that he be restrained with a REACT electronic stun belt for the duration of the trial.[17] On appeal, defendant contends the trial court abused its discretion in ordering the use of the stun belt, and that his constitutional rights were violated by the ruling. We find these contentions meritless.

*1. Background*

On August 29, 1996, before jury selection began, the prosecutor first brought up the issue of defendant's wearing leg restraints. In support of his request for shackling, the prosecutor cited defendant's assault on codefendant Gallegos in a holding cell on September 8, 1995, and defendant's possession of a homemade stabbing device in his cell on July 26, 1996. The prosecutor also mentioned that Varela had attacked and punched defendant in the face at the jail on March 5, 1995. The prosecutor raised as a courtroom security concern the animosity that existed between defendant and Varela because defendant's implication of Varela led to Varela's arrest in this case. The trial court declined to order restraints based on the jail incidents because defendant had done nothing in the courtroom to suggest an intent to act violently or to escape. It did request that additional deputies be assigned to the courtroom, and ordered that defendant and the cells in which he was held be searched before he entered the courtroom. The court said it would reconsider its ruling if new security concerns arose.

---

[17] "REACT" stands for "Remote Electronically Activated Control Technology." (*People v. Mar* (2002) 28 Cal.4th 1201, 1214 (*Mar*).) A stun belt is worn underneath a prisoner's clothing, and, if activated by a remote transmitter, can deliver a brief high-voltage electric shock. (*People v. Lomax* (2010) 49 Cal.4th 530, 560, fn. 8.)

Less than a month later, the trial court revisited the issue of restraints based on concerns expressed by Deputy Sheriff Kathy Fitzpatrick, a courtroom bailiff. In response, the prosecutor asked the court to order that defendant be restrained by means not visible to the jury, either with a leg brace or an electric stun belt.

At a formal hearing on the request, Deputy Fitzpatrick testified she had been a deputy sheriff for 10 years and had been assigned to court services for about a month. Based on incident reports from the jail, she provided details of defendant's assault on Gallegos and the discovery of the toothbrush with attached razorblades in defendant's cell. She testified to an incident a week earlier in which a deputy discovered a handmade "shank" in defendant's one-person cell. Fitzpatrick also expressed security concerns based on her experience with defendant in the courtroom. Fitzpatrick testified the court reporter told her that defendant "watches" her move around the courtroom and "studies" her gun as she moves, and that defendant "looks at" the guns of the other bailiffs when they answer the telephone or move past him. Fitzpatrick began to watch defendant, and noticed he was looking at the gun of a bailiff, Deputy Dennis Young.[18] Fitzpatrick explained that defendant was sitting in very close proximity to the desk at which the three court bailiffs would be sitting or standing by, and that he was also close to the court clerk and the judge. She was concerned "about a lunge towards someone or somebody's weapon." She believed that "the react belt would be the most appropriate," because it was her understanding that "with a leg brace . . . he could still make a lunge."

---

[18]    During cross-examination, Deputy Fitzpatrick testified defendant would stare when attractive women came into the courtroom, and it was stipulated Fitzpatrick was an attractive woman. Defendant implies this was the only reason he was watching her. However, defendant fails to address the testimony that he also was observed staring at a male bailiff.

Another court bailiff, Deputy Young, testified he believed defendant should be restrained because of the type of crime alleged and the incidents at the jail. Deputy Young had no direct experience with electronic stun belts, but believed a stun belt would be the most effective form of restraint.

At the same hearing, Deputy Armando Tapia displayed a REACT electronic stun belt and described how it worked. He was aware of three defendants who previously had worn the belt in Riverside County; in one case, the belt accidentally had been activated.

Defense counsel objected to the use of the belt, contending the prosecution had not shown a need for it because defendant always had been cooperative with court staff. Based on his experience with stun belts, counsel expressed concern jurors would notice its bulk under defendant's clothing and would focus even more attention on defendant, who already stood out as the only defendant facing the death penalty.

The court concluded the prosecution had shown a manifest need for the belt based on defendant's past and current threats, his acts of violence against his codefendants, his actions involving weapons, and his other conduct described at the hearing. It found a real potential that violence would occur, that the restraint was necessary to minimize the likelihood of violence, and that the belt would be unobtrusive and not visible to jurors. It ordered that the belt be used at all of defendant's future court appearances, but said it would revisit this ruling if additional evidence were presented during trial concerning the need for additional restraints or the inappropriateness of the ordered restraint.

During defendant's motion for new trial after the jury verdicts, defense counsel submitted the transcript of an interview with Alternate Juror No. 3, who eventually sat as a deliberating juror at the penalty phase. One set of questions in the interview had involved court security. When asked by trial counsel whether

31

anything about security in the courtroom attracted his attention, the alternate juror said "it looked like [defendant] was wearing some kind of belt" and that "it looked like" the bailiff seated behind defendant "had a box" "maybe" "with a button." Alternate Juror No. 3 stated that "still to this day" he did not know what it was, and denied making any reference to these observations during jury deliberations.[19]

### 2. *Analysis*

"Under California law, 'a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints.' [Citation.] Similarly, the federal 'Constitution forbids the use of visible shackles . . . unless that use is "justified by an essential state interest" — such as the interest in courtroom security — specific to the defendant on trial.' [Citation.] We have held that these principles also apply to the use of an electronic 'stun belt,' even if this device is not visible to the jury. [Citation.]" (*People v. Lomax*, *supra*, 49 Cal.4th at p. 559.)

"In deciding whether restraints are justified, the trial court may 'take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial.' [Citation.] These factors include evidence establishing that a defendant poses a safety risk, a flight risk, or is likely to disrupt the proceedings or otherwise engage in nonconforming behavior.' [Citations.] If the record establishes restraints are necessary, a trial court should select the least obtrusive method that will be effective under the circumstances.

---

[19]     As discussed, *post* at pages 105-107, defendant's new trial motion was based on the claim that Alternate Juror No. 3 committed misconduct by consulting an elder in his church about the church's views on capital punishment. The subject of this juror's possible perception that defendant was wearing a stun belt was not raised in the briefing on the motion for new trial or discussed during the related hearing.

[Citation.]" (*People v. Gamache* (2010) 48 Cal.4th 347, 367.) "Although the court need not hold a formal hearing before imposing restraints, 'the record must show the court based its determination on facts, not rumor and innuendo.' " (*People v. Lomax*, *supra*, 49 Cal.4th at p. 559.) "The court's shackling decision 'cannot be successfully challenged on review except on a showing of a manifest abuse of discretion.' " (*People v. Sheldon* (1989) 48 Cal.3d 935, 945.)

We conclude the trial court did not abuse its discretion in ordering the use of a restraint in this case. It held an extensive hearing at which evidence was presented that defendant posed a safety risk based on incidents in jail and based on his studying the guns of the courtroom bailiffs. The court's finding of a manifest need for some restraint was adequately supported.

We next consider defendant's contention that the trial court did not consider the "least obtrusive or restrictive restraint that effectively [would] serve the specified security purposes." (*Mar*, *supra*, 28 Cal.4th at p. 1226.) He claims the court should have considered leg shackles instead of a stun belt, and that its failure to do so prejudiced him because fear of being shocked by the belt caused him to restrain himself and appear affectless. Defendant points out that, at the penalty phase, the prosecutor mentioned defendant's lack of affect and argued to the jury that it showed defendant lacked remorse for his crime.

In *Mar*, we recognized the invisibility of a stun belt does not make it presumptively the best choice of restraint in all situations, and we directed trial courts to also consider the possible psychological impact of a stun belt on a defendant's participation at trial. (*Mar*, *supra*, 28 Cal.4th at pp. 1226-1227.) In that case, the trial court denied the defendant's request to remove his stun belt when he testified, even though he asserted the belt made him anxious and unable to concentrate. (*Id*. at p. 1224.) We noted that the impact of the stun belt on the defendant's demeanor was particularly important because the case largely turned

33

on his credibility. (*Ibid*.) We concluded the trial court had failed to make a proper finding of manifest need for the stun belt, and that its use constituted prejudicial error because of the relative closeness of the evidence, the importance of the defendant's demeanor while testifying, and the likelihood the belt had some effect on that demeanor. (*Id*. at pp. 1222, 1225.) Defendant contends we likewise should find prejudicial error in his case.

Our instructions in *Mar* to trial courts to consider the psychological impact of stun belts operate prospectively only. They therefore do not apply to defendant's trial, which occurred six years before *Mar*. (*People v. Gamache*, *supra*, 48 Cal.4th at p. 367, fn. 7.) Furthermore, here, the trial court heard testimony that provided a basis for a finding of manifest need for a stun belt, namely, Deputy Fitzpatrick's testimony regarding her fear that defendant might lunge for a bailiff's gun and her belief that leg braces would be less effective in preventing such conduct than a stun belt.

Finally, assuming for the sake of argument that the trial court did not adequately consider the psychological impact of a stun belt on defendant, this case is distinguishable from *Mar* because defendant did not testify. Defendant contends the concerns for the psychological impact on a testifying defendant that *Mar* discussed are relevant to him because "a capital defendant's demeanor is crucial to the jury's penalty determination even if the defendant never takes the stand to testify." However, his attempt to attribute his purportedly affectless facial expression to wearing the stun belt fails. It is not self-evident that a defendant's fear or concern about being shocked by the stun belt would cause a defendant to have an affectless expression, and the defense never stated or suggested that the threat of electric shock affected defendant's mental state. Even assuming it could have such an effect, defendant acknowledges that he showed emotion during trial when his mother testified at the penalty phase. His ability to show emotion on that

34

occasion undercuts his argument that the mere presence of the stun belt prevented him from showing any emotion during other portions of the trial.

On the issue of prejudice, defendant next contends his constitutional rights were violated because at least one juror noticed the stun belt. However, Alternate Juror No. 3 expressed only suspicions about the presence of a belt, rather than a firm conviction, and he stated that he never shared his suspicions about the belt with his fellow jurors. Defendant fails to establish prejudice on this record.

Finally, defendant claims that, even if evidence supported the use of the stun belt during the guilt phase, the situation had changed by the penalty phase. He contends the trial court should have revisited the issue and ordered the belt removed once his codefendants were no longer present, especially in light of how crucial defendant's demeanor was during the penalty phase.

Defendant presents no authority that the trial court had a sua sponte duty to revisit the issue of restraints. If defendant believed the circumstances supporting use of the belt had changed at the penalty phase, he should have so advised the trial court. Because he did not, he has forfeited this claim. (*People v. Duran* (1976) 16 Cal.3d 282, 289.) Defendant contends he should be excused for not raising the issue at the penalty phase because the court's ruling on restraints made reraising the issue futile. However, because the trial court expressly had indicated its willingness to revisit its ruling on restraints in light of any new developments, we conclude defense counsel was not excused from having to renew the issue at the penalty phase in order to preserve it for appeal.

### III. JURY SELECTION ISSUES

#### A. Asserted *Witt* Error

Defendant contends the trial court erred in granting the prosecutor's for-cause challenges to three prospective jurors. A prospective juror may be excused

for cause based on his or her views of capital punishment when " ' the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Uttecht v. Brown* (2007) 551 U.S. 1, 7, quoting *Wainwright v. Witt* (1985) 469 U.S. 412, 424.)  Applying *Witt*, we have stated that " ' " '[a] prospective juror is properly excluded if he or she is unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate.' [Citation.]" [Citation.]  In addition, " '[o]n appeal, we will uphold the trial court's ruling if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous.' [Citations.]" ' " (*People v. Blair* (2005) 36 Cal.4th 686, 743 (*Blair*).)  For the reasons stated below, we conclude the trial court did not err in granting the three challenges for cause in question.

Prospective Juror S.G.

Defense counsel began voir dire by asking whether S.G. could vote for either life without parole or the death penalty.  He answered "Absolutely."  The prosecutor then asked about S.G.'s attitude towards the death penalty.  S.G. said he "was for the most part" against it "philosophically and morally," that it was against his religion.  Given his views, S.G. agreed it would be very difficult for him to realistically consider the death penalty as an option.  He agreed that, if he got to the penalty stage, it was more than likely he would vote for life without parole, his decision would be based on his religious and moral beliefs, and it would not matter what the evidence was.

Defense counsel then asked whether S.G. would follow instructions to consider both options.  S.G. said he would, but added, "[M]y religious and moral beliefs state that everyone basically deserves an opportunity for reform.  And so given that situation, I would say that it would be extremely difficult for me to

36

impose the death penalty." Asked whether he would consider a sentence of death if evidence was presented that a defendant had had past opportunities to reform but remained a continuing threat to the community, S.G. answered "perhaps," but said the mere fact someone failed to take advantage of a past opportunity to reform did not foreclose future reform. He said it was against his moral standards to put someone to death who eventually might reform, even if it took 20 years in prison. Asked whether he nonetheless was open to the possibility of imposing the death penalty, S.G. said there was "a small possibility."

The prosecutor challenged S.G. for cause on the ground that his religious and moral views on the death penalty would impair his ability to consider imposing it. Defense counsel argued S.G. had indicated there was a possibility he would vote for the death penalty. In granting the challenge, the trial court stated it did not believe S.G. was honest when he said it was possible he could impose the death penalty, and concluded S.G.'s religious and moral views would substantially impair his ability to perform his duties as a juror.

Defendant contends the trial court erred in dismissing S.G. because, although S.G. expressed his personal opposition to the death penalty, he consistently said he nonetheless could consider voting for death. We, however, find S.G.'s statements concerning his ability to impose the death penalty conflicting and ambiguous. We therefore accept the trial court's determination as to S.G.'s state of mind, and, based on our review of the record, uphold the trial court's ruling as fairly supported. (*Blair*, *supra*, 36 Cal.4th at p. 743.)

Prospective Juror C.J.

In his questionnaire, C.J. rated himself as a 2 on a 10-point scale, which meant he was against the death penalty, although not "strongly" so.[20] C.J. said he opposed the death penalty because he thought it served no purpose, noting that criminals never were executed and remained on death row for 40 years. In response to the prosecutor's questions, C.J. said he would automatically give life without the possibility of parole and would never impose the death penalty.

In response to questioning by defense counsel, C.J. stated he could put aside his personal views and listen to the court's instructions regarding sentencing options. Asked whether he could be persuaded by other jurors that a death sentence would be right under the law, he answered: "It would be kind of hard. Yes." Asked whether he could agree with other jurors that death was the appropriate penalty, he said he would have to think about it, and it would be against his personal views. Pressed by defense counsel as to whether he could nonetheless vote for death if it was correct under the law, he answered yes.

When the prosecutor asked whether C.J. could individually and voluntarily agree to impose a sentence of death, C.J. stated: "I'd pray on it. If I have to come to that decision, that's what I have to live with. I'd try to persuade them to life." Asked whether his opposition to the death penalty would impair his ability to be a good juror, C.J. answered: "I could be a good juror. But come to the death penalty, I just have to try to live with it. I mean, I don't like it. It's against my morals. But if I have to break one of my morals, I just have to break one of them."

---

[20] We will refer to the jury questionnaire's 1 to 10 scale, with 1 indicating least in favor of the death penalty and 10 indicating most in favor of the death penalty, throughout our discussion of the juror selection issues by simply reporting the number the prospective juror marked.

The prosecutor challenged C.J. for cause. Defense counsel countered that C.J. had said he would set aside his moral principles to return a death verdict if appropriate. The trial court granted the challenge for cause, stating, "I don't believe he was being particularly candid. I noticed he tried to evade certain of the questions." It found C.J.'s views on capital punishment, "religious and otherwise, would substantially impair his performance of his duties as a juror in this case in accordance with the instructions and his oath."

Defendant contends the trial court erred in dismissing C.J. because, while C.J.'s responses may have lacked eloquence, he understood the difference between his personal views and his duties as a juror and said he could perform those duties. C.J. asserted conflicting views given his initial response that he would never impose the death penalty. Although C.J. eventually said he could vote for death by "break[ing] one of [his] morals," the court found this statement insincere. We accept the trial court's determination as to C.J.'s state of mind given the conflicting or ambiguous statements, and we uphold the trial court's ruling as fairly supported by the record. (*Blair*, *supra*, 36 Cal.4th at p. 743.)

Prospective Juror O.G.

O.G. had mixed emotions on the death penalty. While she thought it might be appropriate in some cases, she "was not sure that she was the one to say that someone should die." In response to questions by the prosecutor, she affirmed she would always vote for life without parole, regardless of the evidence.

Defense counsel sought to rehabilitate O.G. He reminded her she previously had indicated she would not automatically vote for life without parole, and had indicated her willingness to put aside her personal feelings and do her duty as a juror, including imposing the death penalty in an appropriate case. O.G. said she had had a change of heart concerning imposition of the death penalty: "I couldn't talk about this with my pastor or anybody like that. . . . So I prayed to the Lord

39

myself. And I am convinced that I should not be the one to say someone should die."

Defense counsel told O.G. imposing a death sentence was something any juror should find difficult, but he wanted to know whether she thought she could do it. O.G. responded, "[W]hen it comes right to it, I don't know if I could." Defense counsel asked what O.G. would do if the evidence pointed to the death penalty, the other 11 jurors thought the death penalty would be the appropriate penalty, and she agreed with them. She answered, "Honestly, . . . I don't know if I could do that. But I always pray for answers. That's where I would be at that moment."

The prosecutor challenged O.G. for cause. Defense counsel argued that, while O.G. was sensitive and personally reluctant to impose the death penalty, her views did not prohibit her from doing so. The trial court granted the challenge, stating: "I watched her very closely, and I think her statement that she would not impose the death penalty under any circumstances is probably closer to the truth." Based on our review of the record, we uphold the trial court's ruling as fairly supported, and we accept the trial court's determination as to O.G.'s state of mind given her conflicting or ambiguous statements. (*Blair*, *supra*, 36 Cal.4th at p. 743.)

### B. Asserted *Batson/Wheeler* Error

Trial counsel brought three motions under *Batson v. Kentucky* (1986) 476 U.S. 79, 84-89 and *People v. Wheeler* (1978) 22 Cal.3d 258, 276-277 (*Batson/Wheeler*). Two challenged the prosecutor's use of peremptory challenges against six African-American prospective jurors, and the third challenged his use of peremptory challenges against five Hispanic prospective jurors. The trial court denied all three. Defendant renews the motions here, and, for some of the

40

challenged prospective jurors, he engages in comparative juror analysis arguments for the first time on appeal.

The three-stage procedure of a *Batson/Wheeler* motion is familiar. "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' " (*Johnson v. California* (2005) 545 U.S. 162, 168, fn. omitted.)

With one exception, Prospective Juror C.P., who is discussed, *post*, at pages 47 to 50, the trial court found that defendant had stated a prima facie case for the challenged prospective jurors. For a third stage *Batson/Wheeler* inquiry, "[r]eview of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions." (*People v. Lenix* (2008) 44 Cal.4th 602, 613 (*Lenix*).) The same standard applies to a comparative juror analysis. (*Id*. at p. 627.) "We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses." (*People v. Burgener* (2003) 29 Cal.4th 833, 864.) As long "as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal." (*Ibid*.)

For the reasons that follow, we conclude substantial evidence supports the trial court's denial of each of defendant's *Batson/Wheeler* motions. (*Lenix*, *supra*, 44 Cal.4th at pp. 613, 627.)

## 1. The African-American Prospective Jurors

Defense counsel made a *Batson*/*Wheeler* motion regarding the prosecutor's peremptory challenge against Prospective Juror K.P., who was African-American. The trial court denied the motion, finding no prima facie case had been made. The next day, defense counsel made a second *Batson*/*Wheeler* motion following the prosecutor's peremptory challenges against four African-American jurors: D.M., W.J., I.T., and L.W. The court found a prima facie case had been established and extended its finding to include Prospective Juror K.P. After hearing the prosecutor state his reasons for excluding these jurors, the trial court remarked, "In evaluating those reasons, it's completely understandable why he would have asked each of these jurors to be excused by using his peremptory challenges." The trial court found that there were "honest race-neutral reasons for excusing each of these jurors," and denied the *Batson/Wheeler* motion.

Later that day, defense counsel brought a *Batson*/*Wheeler* motion regarding the prosecutor's peremptory challenge against Prospective Juror P.K., another African-American. The trial court assumed a prima facie case existed for P.K. as well. After hearing the prosecutor's reasons for excluding P.K., the trial court found that the prosecutor was "candid and honest" in stating a race-neutral reason, and denied the motions.

Before addressing the individual prospective jurors at issue, we observe that at the time the jury was empanelled, three African-Americans were seated on the jury. The presence of these jurors on the panel is one indication of the prosecutor's good faith in exercising his peremptory challenges to exclude the African-American prospective jurors in question. (*People v. Lewis*, *supra*, 43 Cal.4th p. 480.)

42

Prospective Juror K.P.

The prosecutor explained his peremptory challenge of K.P. as follows: "[B]oth she and her husband had been through the justice system and had been convicted of crimes. Her husband is involved in narcotics and spousal abuse. I believe she indicates that he is currently addicted to drugs and alcohol."

Defendant does not dispute the prosecutor's stated reasons are supported by answers in K.P.'s questionnaire. Instead, he contends a comparative juror analysis undermines the genuineness of those grounds because K.P. was not the only member of the venire to report problems with law enforcement. Defendant describes the following background information for the non-African-American sitting jurors.[21] Three had a husband, father, or brother who had been convicted of driving under the influence. One had used drugs in her youth, her sister had a drug problem, and her husband had a drinking problem although he had been sober for two years. One had a stepson with drug problems that had resulted in juvenile court intervention and a drug program. One juror had been arrested and charged with domestic violence, although the charges later were dropped.

K.P.'s background is distinguishable from the jurors with whom she is compared because of her conviction for the crime of theft and by the apparent severity and ongoing nature of her husband's drug addiction. We conclude substantial evidence supports the trial court's denial of the motion as to K.P.

---

[21] Defendant acknowledges the juror questionnaires do not contain information about the race or ethnicity of prospective jurors. He bases his inference that various seated jurors were not African-American on defense counsel's statement that, at the time the prosecutor accepted the panel, he had excused five out of seven African American jurors who were in the jury box. Based on defendant's identification of the remaining two jurors as African American, he concludes the remaining seated jurors were not African-American.

<u>Prospective Juror D.M.</u>

The prosecutor explained he excused D.M. because "he is against the death penalty," and had written in his questionnaire that he always had been against the death penalty "because rich people very seldom are ever put to death. However, some cases are so heinous, it needs to be imposed." The prosecutor noted D.M. had added that he opposed the death penalty because "it is unfairly applied." The prosecutor said he was concerned about D.M.'s views because he knew what the evidence would show about defendant's background.

Defendant contends the prosecutor's explanation was pretextual because some non-African-American jurors whom he did not challenge voiced less support for capital punishment than D.M. D.M. rated himself 6 on the 10-point scale. Defendant notes three non-African-American prospective jurors rated themselves 5 on the 10-point scale, and he contends one could interpret the remarks of at least one of them as reflecting more ambivalence about the death penalty than D.M. had voiced.

Defendant does not dispute that, unlike D.M., none of the jurors to whom he compares D.M. expressed their ambivalence in the terms of a specific concern that the death penalty was seldom used against the wealthy. Instead, he contends the prosecutor had no reason to be concerned about D.M.'s specific views on the death penalty because there was no evidence of poverty or deprivation in defendant's family background. We disagree. However one might characterize defendant's background, it was not one of wealth. The prosecutor's concern about D.M.'s specific view on the application of the death penalty distinguishes D.M. from those other jurors. Substantial evidence supports the trial court's denial of the motion as to D.M.

44

Prospective Juror  W.J.

The prosecutor explained he had challenged W.J. primarily because he did not appear to be adequately educated to comprehend the complicated jury instructions that would be used in the case.  He noted W.J. had misspelled many words in his questionnaire, including "honest," "offense," and "misdemeanor," and that W.J. had been convicted of a misdemeanor for possession of stolen property.  The prosecutor expressed concern that W.J. would not fairly and effectively evaluate the evidence.  The trial court concurred in the prosecutor's assessment, stating that W.J. had not seemed to comprehend fairly simple questions during voir dire by Hawkins's trial counsel.

Defendant contends W.J.'s educational level was comparable to other jurors the prosecutor accepted.  W.J. had completed high school and taken some college classes, whereas one prospective juror had no college experience and two others had taken college classes but received no degrees.  Defendant notes the prospective juror who lacked college experience also made numerous spelling errors in his questionnaire.  But defendant fails to show that these other jurors also showed difficulty comprehending voir dire questions or had been convicted of a misdemeanor.  Substantial evidence supports the trial court's denial of the motion as to W.J.

Prospective Juror  I.T.

I.T. had a brother incarcerated at San Quentin for murder, but she said his experience would not influence her decision-making.  She rated herself a 2 on the scale of 1 to 10.  She believed her Christian faith did not favor capital punishment, but stated she would follow the law rather than her personal agenda, and that she could impose the death penalty for a single special circumstance murder.

The prosecutor explained he had challenged I.T. because, although she indicated she would consider the death penalty, he did not believe she could do so.

45

He pointed to her statements in her questionnaire that "God gave life, and only God should take it away," and "I am a Christian and study the Bible, and I don't remember reading that God gave another human being the authority to make a decision to kill another."  The reluctance of a juror to impose the death penalty based on religious belief is a permissible ground for the exercise of a peremptory challenge.  (*People v. Catlin* (2001) 26 Cal.4th 81, 118-119.)  Defendant acknowledges that "standing alone, the prosecutor's challenge to I.T. might not be remarkable."  We conclude substantial evidence supports the trial court's denial of the motion as to I.T.

Prospective Juror  L.W.

The prosecutor explained he had challenged L.W. because his questionnaire indicated he was widowed and had retired from the military in 1974, but there was "a complete void as to what he's been doing since 1974."  The prosecutor was concerned L.W. wrote he had no opinion on the death penalty, but also wrote that it served no purpose.  The prosecutor questioned whether a juror who thought the death penalty served no purpose would seriously consider the People's arguments in its favor.  He was also concerned L.W. believed O.J. Simpson properly was acquitted because officers in that case "took the Fifth Amendment."

Claiming the prosecutor's stated reasons were pretextual, defendant points to the fact L.W. rated himself as 5 on the 10-point scale.  Defendant incorporates the same comparative argument he made in regard to D.M., namely, that other prospective jurors not challenged by the prosecutor gave themselves the same neutral rating.  Defendant presents his comparative juror arguments at a high level of generality, ignoring the prosecutor's stated concern that L.M believed that the death penalty served no purpose.  Such a belief could a cause a prosecutor concern despite L.M.'s self-rating as neutral on the death penalty.  The prosecutor's additional concern that he did not have a good sense of who L.W. was finds

46

support in the record in light of L.M.'s failure to provide any information after 1974. Defendant's argument to the contrary, the fact that the prosecutor could have asked more questions to illuminate L.W.'s background does not cause us to regard the prosecutor's stated reasons as pretextual. Substantial evidence supports the trial court's denial of the motion as to L.W.

Prospective Juror P.K.

The prosecutor explained he had challenged P.K. because of his opposition to the death penalty, noting that in his questionnaire P.K. had written he was opposed to the death penalty due to its application and history in the United States, and had rated himself a 2 on the 10-point scale. Opposition to the death penalty is a permissible, race-neutral reason for a peremptory challenge. (*People v. McDermott* (2002) 28 Cal.4th 946, 970-971.) In asserting the prosecutor's stated reason for P.K.'s excusal was pretextual, defendant simply refers to his earlier argument concerning Prospective Juror I.T, and he again acknowledges the challenge standing alone would be unremarkable. We conclude substantial evidence supports the trial court's denial of the motion as to P.K.

### 2. *The Hispanic Prospective Jurors*

After the trial court denied defendant's *Batson/Wheeler* motions concerning African-American jurors, defendant made two similar motions concerning a total of five Hispanic prospective jurors: L.C., D.Q., C.P., D.L., and G.H.[22] After reviewing the questionnaires, the trial court observed that there were several evident reasons for excusing C.P. and D.Q., but found that a prima facie case had

---

[22] Defense counsel conceded that, in the case of an additional Hispanic prospective juror, R., there was an apparent race-neutral reason for the prosecutor's peremptory challenge, and excluded R. from his motion.

47

been made, at least as to L.C., D.L., and G.H.  After hearing the prosecutor state his reasons for challenging these prospective jurors, the court found they were race-neutral and "honestly stated," and denied the *Batson*/*Wheeler* motions.  We find substantial evidence supports the trial court's rulings.

Prospective Juror C.P.

The prosecutor was not required to state his reasons for his peremptory challenge of C.P. because "[j]ustifications for the challenged peremptories need only be given if the court rules that a prima facie case does exist."  (*People v. Fuentes* (1991) 54 Cal.3d 707, 717, fn. 5.)  Defendant, however, contends the trial court erred because, in the course of finding the defense had made no prima facie case as to C.P., the court remarked on an apparent race-neutral reason for the challenge and thereby improperly assisted the prosecutor by supplying its own reason for excusing C.P.

After defense counsel made his first *Batson*/*Wheeler* motion regarding four Hispanic prospective jurors, the trial court stated that it had reviewed the questionnaires of C.P and D.Q., and "[t]here very well may be a good reason for the district attorney to dismiss them."  It then said, "As to [L.C.] and [D.L], I don't know what the reasons would be.  I do believe there's a prima facie case shown sufficient to have the district attorney explain his reasons for the dismissal of these jurors."  By "these jurors," the court apparently referred only to L.C. and D.L, and defendant has adopted this view in his summary of the procedural facts.  The court discussed the apparent race-neutral reasons the prosecutor may have had for dismissing C.P. and D.Q., observing that C.P. had written that he was "generally against the death penalty" but "believe[d] in special cases it's proper."  The court said this comment "shows somewhat of a reluctance to apply the death penalty, as he indicated during the examination for cause."  As to D.Q., the trial court observed she had answered a question about good or bad experiences with law

48

enforcement by writing: "A police report regarding the molestation of my son was closed by Riverside P.D. because I refused to bring my 4-year-old son down to the police station for questioning." The court observed that this comment indicated a bias against police, which would be a reason for the use of a peremptory challenge.

Although the trial court appeared to rule a prima facie case had not been made as to C.P. or D.Q., the prosecutor nonetheless stated his reasons as to D.Q. The prosecutor then gave reasons for excusing L.C. and D.L., for whom the court expressly found that a prima facie case had been made. Finally, the court asked the prosecutor: "[D]id you speak to [C.P.], I believe you did. Is that correct?" To which counsel for *defendant* answered: "Yes." The trial court's late question about C.P. raises a possible ambiguity about whether it had found no prima facie case as to C.P. However, because the trial court initially had appeared to find no prima facie case as to C.P., the burden was on defendant to resolve this ambiguity. *Wheeler* requires that the moving party make as complete a record as feasible, and the general rules of appellate review require appellants to demonstrate error. (*People v. Morris* (2003) 107 Cal.App.4th 402, 408.) Here, by incorrectly stating that the prosecutor had addressed C.P., counsel for defendant foreclosed any elaboration of why the court mentioned C.P. at this point. [23] Defendant therefore failed to make a record that the trial court had ruled a prima facie case existed as to C.P. Accordingly, we treat the trial court's ruling as to C.P. as a first stage denial.

---

[23]    A trial court occasionally will find that no prima facie case has been made but will ask the prosecutor to state reasons out of an abundance of caution. (See *People v. Howard* (2008) 42 Cal.4th 1000, 1018 (*Howard*).)

Citing our comment that "ordinarily the court should not attempt to bolster a prosecutor's legally insufficient reasons with new or additional factors drawn from the record" (*People v. Ervin* (2000) 22 Cal.4th 48, 77), defendant contends the trial court improperly assisted the prosecutor by supplying its own reasons for excusing C.P. In *Ervin*, it is not clear whether the trial court stated additional factors before or after the prosecutor stated his reasons. In any event, there is no question here of the trial court's bolstering the prosecutor's reasons for excusing C.P. because the prosecutor never stated his reasons for doing so.

We regard the trial court's discussion of possible reasons for the peremptory challenges of C.P and D.Q. as part of its ruling that a prima facie case had not been made as to them. When reviewing the denial of a first stage *Batson/Wheeler* inquiry, we sustain the trial court's ruling if, upon our independent review of the record, we conclude the totality of the relevant facts does not give rise to an inference of discriminatory purpose. (*Howard*, *supra*, 42 Cal.4th at p. 1018.)

The record reveals that C.P. was reluctant to impose the death penalty. He rated himself a 2 on the 10-point scale. As the trial court observed, when asked to describe his feelings about the death penalty, C.P. wrote: "I am generally against the death penalty. But I believe in special cases it is the proper penalty." When the prosecutor asked whether C.P. would consider the death penalty appropriate in a case involving the murder of one person and a defendant who did not have a significant prior criminal record, C.P. stated it depended on the circumstances of the case, but "the one I can think of that I'm not against is like the guy who abducted Polly Klaas." Because C.P.'s comments suggested he was reluctant to impose the death penalty for anything other than a case as notorious as the murder of Polly Klaas, we conclude the totality of relevant facts does not give rise to an inference of discriminatory purpose in the prosecutor's peremptory challenge of C.P. (*Howard*, *supra*, 42 Cal.4th at p. 1018.)

50

Prospective Juror D.Q.

Although the trial court found no prima facie case as to D.Q., the prosecutor went on to discuss his reasons for his peremptory challenge of her. "When the trial court expressly states that it does not believe a prima facie case has been made, and then invites the prosecutor to justify its challenges for the record on appeal, the question whether a prima facie case has been made is not mooted, nor is a finding of a prima facie showing implied." (*Howard*, *supra*, 42 Cal.4th at p. 1018.) However, out of an abundance of caution, and because the prosecutor proffered race-neutral reasons that the trial court ruled upon, we will analyze D.Q. as a third stage *Batson/Wheeler* denial. (See *People v. Riccardi* (2012) 54 Cal.4th 758, 786-787; *People v. Mills* (2010) 48 Cal.4th 158, 174.)

Preliminarily, the prosecutor stated he did not believe D.Q. was Hispanic. But because the trial court assumed she was, the prosecutor presented reasons for his challenge. He said he was concerned about D.Q.'s "ditzy" attitude and demeanor in court, and that, from the way she interacted with other jurors, he felt she was interested in "having a good time." He was concerned D.Q.'s state of mind would not mix well with the predominantly female composition of the jury. The prosecutor also was concerned about D.Q.'s negative experience with law enforcement. He was concerned that D.Q. believed a police detective had closed an investigation of a molestation report D.Q. made concerning her son because he had been unwilling to do the work to pursue the investigation, and that his unwillingness had prevented the justice system from doing its job.

Defendant contends the prosecutor's stated reasons were pretextual because D.Q. appeared to be a strong proponent of the death penalty based on her questionnaire, including her rating herself an 8 on the 10-point scale. Defendant does not present any comparative juror analysis arguments based on D.Q.'s support of the death penalty. The prosecutor's stated reasons were race neutral

and were permissible bases for a peremptory challenge. (*People v. Reynoso* (2003) 31 Cal.4th 903, 917 [peremptory challenge based on demeanor and body language]; *People v. Turner* (1994) 8 Cal.4th 137, 171 [peremptory challenge based on negative experience with law enforcement ].) Defendant complains the trial court failed to make an independent finding that D.Q. actually exhibited the demeanor attributed to her by the prosecution, but a trial court is not required "to make explicit and detailed findings for the record in every instance in which the court determines to credit a prosecutor's demeanor-based reasons for exercising a peremptory challenge." (*People v. Reynoso*, *supra*, 31 Cal.4th at p. 929.) As in *Reynoso*, the trial court here was fully apprised of the demeanor based reason, which was neither contradicted by the record nor inherently absurd. (*Ibid.*)

Defendant additionally contends the prosecutor's reference to D.Q.'s negative experience with law enforcement should be discounted because the trial court had mentioned it, and had improperly bolstered the prosecutor's statement of reasons. As discussed above in relation to C.P., we reject defendant's contention that the trial court engaged in bolstering. In the case of D.Q.'s negative experience with law enforcement, the prosecutor previously had raised the issue with D.Q. during voir dire. This was not an issue the trial court raised for the first time on its own to bolster the prosecutor's statement of reasons. Substantial evidence supports the trial court's denial of the motion as to D.Q.

Prospective Juror L.C.

In explaining why he challenged L.C., the prosecutor acknowledged that, in some respects, L.C. appeared to be an excellent juror for the prosecution. For example, L.C. rated himself a 10 on the 10-point scale. The prosecutor then expressed concern because L.C. was an elder in the Seventh Day Adventist Church and had written that he considered life without parole in prison to be a more severe penalty than the death penalty. This caused the prosecutor to question

52

L.C.'s true attitude towards the death penalty. The prosecutor said he did not question L.C. about his views on the death penalty in chambers because he did not think it was necessary.

We have upheld the exercise of peremptory challenges to prospective jurors who, although not excusable for cause, have expressed reservations about the death penalty. (*People v. Turner*, *supra*, 8 Cal.4th at p. 171.) Defendant contends the prosecutor's failure to question L.C. about his attitudes regarding the death penalty shows the stated reason for the peremptory challenge was pretextual. We disagree. While the prosecutor's concern may not have risen to a level that supported excusing L.C. for cause, it encompassed two race-neutral reasons supported by the record, namely, that L.C. was an elder in his church and his doubt that the death penalty was as severe a sentence as life without the possibility of parole. Excusing prospective jurors who hold religious views that make it difficult for them to impose the death penalty is a proper, nondiscriminatory ground for a peremptory challenge. (*People v. Cash* (2002) 28 Cal.4th 703, 725.) Substantial evidence supports the trial court's denial of the motion as to L.C.

Prospective Juror D.L.

The prosecutor explained that D.L. appeared to have no opinions about almost anything, an assessment that the trial court agreed was a "fairly accurate depiction of his answers." D.L. ranked himself 5 on the 10-point scale, and wrote he was neither for nor against the death penalty, a comment that the trial court also remarked upon. D.L. also wrote he had no feelings about, or did not care about, several high profile criminal cases, including the O.J. Simpson case. The prosecutor was concerned D.L. had no opinion on important issues and appeared to be uninformed about them. The prosecutor also said he had concerns about D.L.'s apparent lack of education, which was reflected in his misspelling of the words "juror" and "trial."

53

Defendant notes D.L. graduated from high school and his spelling was no worse than that of many other jurors. He also contends D.L.'s lack of interest in high-publicity criminal cases does not support the prosecutor's stated concern that D.L. lacked concern for important issues. Defendant compares D.L. to seated jurors who expressed similar neutral self-ratings on the death penalty in their questionnaire, and refers to his comparative juror arguments in connection with D.M. However, defendant fails to show that these other jurors expressed the same lack of opinions across several subject areas as is shown in D.L.'s questionnaire. Substantial evidence supports the trial court's denial of the motion as to D.L.

Prospective Juror G.H.

The prosecutor explained his main concern with G.H. was his level of education. He noted that G.H.'s questionnaire had illegible writing and misspelled words, including a misspelling of the word "manager," a word that described his current job. The prosecutor explained he wanted the jurors for this trial to be well-educated because there would be complicated instructions. He asked that the court take note that he had exercised many of his peremptory challenges to obtain an intelligent jury. The trial court additionally observed that the prospective juror's name did not appear to be a Hispanic name.

Defendant contends the record shows the prosecutor's stated reasons were pretextual because, other than his race, G.H. appeared to be a juror who would be favorable to the prosecution. G.H.'s family was involved in law enforcement, and G.H. rated himself 10 on the 10-point scale. Defendant points to another prospective juror, D.H.M., who was not challenged by the prosecutor but whose questionnaire contained some misspellings. While D.H.M.'s questionnaire did contain some misspellings, G.H.'s questionnaire, by contrast, contained several illegible and illiterate entries in addition to its many misspellings. We conclude substantial evidence supports the trial court's denial of the motion as to G.H.

54

## A.  Gang Evidence Claims

Defendant contends the trial court erred in admitting the gang evidence presented at trial.  Additionally, assuming certain gang evidence was admissible, defendant claims the prosecution violated its discovery obligation by untimely disclosing its gang expert witness, and that the trial court erred in denying the defense a continuance to prepare for voir dire of the expert.  Defendant also contends the proffered gang testimony should have been excluded because the gang expert witness was not qualified to testify.  For the reasons discussed below, we find no reversible error based on the admission of the gang expert's testimony.

### 1.  Admission of Gang Evidence

#### a.  Background

Defendant filed a motion to exclude any gang evidence under Evidence Code section 352,[24] and argued that the introduction of such evidence would violate his state and federal constitutional rights.  The prosecutor argued evidence of the codefendants' membership in the VBR gang was relevant to show the social association between the codefendants before, during, and after the murder, and that their association was relevant to the issue of aiding and abetting.  The prosecutor also argued gang evidence was necessary to explain the meaning of defendant's statement after the murder regarding his "earning a stripe."  Defendant argued the codefendants' association was not a contested issue because numerous

---

[24] Evidence Code section 352 provides:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

witnesses had identified them as being together on the night of the murder. The trial court overruled the defense objections, but agreed to give appropriate limiting instructions about the gang evidence. Later, after the hearing on Sergeant Beard's qualification as an expert witness, defendant unsuccessfully renewed his objection to the admission of gang evidence.

The prosecution presented its gang evidence through the testimony of Sergeant Beard, who testified that VBR was a gang operating in 1994 on the south side of Beaumont. He testified that two address books, one taken from the residence of Hawkins and one taken from defendant's residence, contained gang-style lettering and lists of gang monikers. He described tattoos on defendant, Hawkins, and Gallegos, including one on defendant reading "SUR XIII," a tattoo commonly associated with Hispanic street gangs in Southern California, and another that read "E.S.C.," which stood for East Side Colton.[25] Over defendant's objection, Sergeant Beard testified a person could be "jumped" into a gang by committing a crime for the group or by being beaten up. He testified Hawkins was a VBR member and Gallegos was an "associate," but neither defendant nor Varela were members.

At the end of Sergeant Beard's testimony, the trial court instructed the jury that "testimony relating to gang membership was admitted for the limited purpose of showing, if believed, that there existed an association between two or more of the defendants at the time of the alleged crimes. It cannot be considered for any other purpose."

---

[25] Defense counsel argued defendant's E.S.C. tattoo showed that, if defendant had any connections to a gang, it was to one from his hometown of Colton, rather than to a gang from Beaumont such as VBR.

### b. *Analysis*

While gang membership evidence does create a risk the jury will impermissibly infer a defendant has a criminal disposition and is therefore guilty of the offense charged (*People* v. *Williams* (1997) 16 Cal.4th 153, 193 (*Williams*)), "nothing bars evidence of gang affiliation that is directly relevant to a material issue." (*People* v. *Tuilaepa* (1992) 4 Cal.4th 569, 588.)

Here, the gang affiliation evidence was relevant to show the codefendants' relationship with each other and that defendant and the codefendants were part of the group that attacked and killed Walker. Defendant argues the evidence of association was cumulative because other witnesses provided uncontradicted testimony that the codefendants were together on the evening of the murder. However, as defendant acknowledges, codefendant Hawkins tried to raise a doubt about whether he left the party with the group that killed Walker and disposed of his car. Furthermore, prosecution witness Hanvey was unable to identify defendant or Gallegos in a photographic lineup as having been part of the group of Hispanic men at Jay's Market where the codefendants may have met Walker before kidnapping him and going to the party. The gang affiliation evidence therefore was highly relevant, and not cumulative, in proving the codefendants' relationship with each other and their involvement in the charged crimes.

Evidence of gang affiliation also served to explain defendant's motive for committing the crimes, particularly the murder. After the killing, defendant bragged about "earning his stripes," which suggests he intentionally killed Walker to gain membership in a gang. Defendant contends the gang association evidence was not particularly probative because only Hawkins was a VBR member and Gallegos only was identified as an "associate." However, because the evidence suggests defendant may have committed the murder in order to gain membership

in the gang, his lack of membership in VBR at the time of the murder does not affect the probative value of the proffered evidence.

We conclude the probative value of the gang evidence was not substantially outweighed by the risk of undue prejudice. We have observed that, because gang evidence may have a highly inflammatory impact on the jury, trial courts should carefully scrutinize such evidence before admitting it. (*Williams, supra*, 16 Cal.4th at p. 193.) Here, the trial court weighed the probative value of the evidence against its prejudicial impact, and reasonably concluded the evidence should be admitted. "The admission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason. [Citation.]" ( *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369.) Because the gang evidence was highly probative in this case, and the trial court gave a limiting instruction designed to lessen the risk of undue prejudice, we cannot say the trial court's decision to allow the gang affiliation evidence exceeded the bounds of reason.

### 2. *Untimely Disclosure of Gang Expert*

#### a. *Background*

On September 5, 1996, at the hearing on defendant's motion to exclude gang evidence from his trial, the trial court told the prosecutor he must use an expert witness to present gang evidence, and it directed him to provide the defense with information on his gang expert within the next four days. Defendant's trial began on September 13, 1996, but the defense did not receive information about the proposed gang expert until the morning of November 4, 1996, well into the presentation of the prosecutor's case-in-chief. That same day, the trial court held an Evidence Code section 402 hearing on the expert's qualifications and the admissibility of his testimony. When defendant's counsel was offered the

58

opportunity to cross-examine Sergeant Beard, she told the court she was not ready because she only learned about the proposed expert that morning. The trial court denied counsel's request for a continuance, noting this was "a very limited area." Defendant's counsel then cross-examined Sergeant Beard. At the end of the hearing, the trial court found the sergeant was qualified to testify as a gang expert.

### b. Analysis

Defendant contends the trial court's denial of counsel's request for a continuance constituted an abuse of discretion and a denial of due process.[26] He argues that had the defense been afforded sufficient time to prepare for the in limine hearing, it could have established that Sergeant Beard was not qualified to testify as an expert. Defendant's claim of prejudice based on the denial of the continuance therefore rests on his argument that Sergeant Beard was not qualified to testify as a gang expert. (*People v. Beames* (2007) 40 Cal.4th 907, 921.) We need not decide whether the trial court abused its discretion by failing to grant defense counsel a continuance because, as discussed in the next section, the record reflects that Sergeant Beard was amply qualified to testify as a gang expert. Even if the trial court erred in denying the continuance, defendant was not prejudiced, and therefore the error was harmless.

### 3. Gang Expert's Qualifications to Testify

At the end of the in limine hearing, defendant contended Sergeant Beard was unqualified to testify as an expert witness on gangs. The trial court ruled Sergeant Beard could testify as a gang expert.

---

[26] The People acknowledge that, pursuant to sections 1054.1 and 1054.7, a prosecutor is required to disclose to the defense at least 30 days prior to the trial the names and addresses of witnesses the prosecutor intends to call, unless the prosecutor shows good cause. Under section 1054.5, one remedy for late disclosure is a continuance of the matter.

At the in limine hearing, Sergeant Beard testified to having the following qualifications: He was a Beaumont police officer for six years, during which time he gained familiarity with the active street gangs in the area. He was specifically familiar with the Hispanic street gang VBR, its members, their monikers (nicknames), and their tattoos. He had undergone 20-to-30 hours of training on the identification of gang members and Hispanic youth gangs through the Department of Justice and the San Bernardino and Riverside County Sheriff's Departments.

" 'A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates.' (Evid. Code, § 720, subd. (a).) ' "The trial court is given considerable latitude in determining the qualifications of an expert and its ruling will not be disturbed on appeal unless a manifest abuse of discretion is shown." ' [Citation.]" (*People v. Davenport* (1995) 11 Cal.4th 1171, 1207.)

Defendant notes that, at the time of his testimony in defendant's case, Sergeant Beard had never before qualified to testify in court as a gang expert. Defendant points to *Williams*, in which the officers who qualified as gang experts had more years of experience with gangs and more hours of specialized training, and had qualified as gang experts in prior trials. (*Williams*, *supra*, 16 Cal.4th at p. 195.) Although Sergeant Beard's experience and training was not as extensive as that of the officers in *Williams*, we conclude that, given Sergeant Beard's experience, training, and specific knowledge of a gang involved in this case, the trial court did not abuse its discretion in allowing him to testify as a gang expert.

## B. Admission of Autopsy Photographs

Over a defense objection, the trial court admitted into evidence 13 autopsy photographs of the victim wearing blood-soaked clothing. The photographs depicted various close-up views of Walker's gunshot wounds; in several photographs, Walker's eyes are open in a "death stare." Defendant renews his objection that the trial court abused its discretion by admitting the autopsy photographs. He argues they were irrelevant or cumulative, and that, if relevant, they should have been excluded under Evidence Code section 352 because their probative value was substantially outweighed by the probability their admission would create a substantial danger of undue prejudice. (*People v. Carter* (2005) 36 Cal.4th 1114, 1166.)

" 'The admission of photographs of a victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory. [Citations.] The court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect. [Citations.]' " (*People v. Ramirez* (2006) 39 Cal.4th 398, 453-454, quoting *People v. Crittenden*, *supra*, 9 Cal.4th 83 at pp. 133-134.)

The admitted autopsy photographs were very probative in this case. They assisted the jury in understanding the testimony of the pathologist. (See *People* v. *Lucas* (1995) 12 Cal.4th 415, 449-450.) They provided circumstantial evidence of the defendants' intent to kill. The nature and placement of the wounds indicated Walker had been shot as he tried to exit his car trunk, which was relevant to the prosecution's theory that defendant and the codefendants drove Walker to a remote location with the intention of killing him. (See *People* v. *Wilson* (1992) 3 Cal.4th 926, 937-938.) The photographs were not made inadmissible by the

prosecutor's ability to prove motive, intent, and cause of death through other evidence. (*People v. Watson* (2008) 43 Cal.4th 652, 685.)

We have examined the admitted photographs, as well as the three photographs that the trial court excluded under Evidence Code section 352. While the admitted photographs confirm that "murder is seldom pretty" (*People v. Long* (1974) 38 Cal.App.3d 680, 689), they are not of such a nature as to overcome the jury's rationality. (*People v. Gurule* (2002) 28 Cal.4th 557, 625.) We conclude the trial court did not abuse its discretion in determining the probative value of each of the admitted photographs was not substantially outweighed by the risk of undue prejudice.

### C. Objections to the Testimony of George Varela

Codefendant Salvador Varela's brother George was a key witness for the prosecution. Defendant contends the trial court erred in overruling two of his evidentiary objections relating to George's testimony.

#### 1. *"Riding Around With a 187"*

George testified that, on the day after the murder, he was driving defendant home when defendant bragged to George about how he shot Walker. George initially disbelieved defendant's story, but changed his mind when his friend, Victor Dominguez, came up to the car and told George, "You're riding around with a 187," a reference to section 187, our state's murder statute ("187"). Later, George, defendant, and Dominguez went inside defendant's home where George heard defendant tell his father, "I had to do it. I ain't gonna let four vatos go down for some white boy."

Prior to this portion of George's testimony, defendant had objected on hearsay grounds to the admission of Dominguez's "187" statement. [27] After the prosecutor explained that the statement was being offered not for its truth, but to explain George's subsequent conduct, the trial court overruled the objection and instructed the jury that "the next statement is entered only for the purpose of explaining this witness's further action."

Defendant concedes an out-of-court statement can be admitted for the nonhearsay purpose of showing that it imparted certain information to the hearer, and that the hearer, believing such information to be true, acted in conformity with such belief. (*People v. Hill* (1992) 3 Cal.4th 959, 987.) The nonhearsay purpose must also be relevant to an issue in dispute. (*People v. Armendariz* (1984) 37 Cal.3d 573, 585; 1 Witkin, Cal. Evidence (5th ed. 2012) Hearsay § 41, p. 835; 1 Jefferson, Cal. Evidence Benchbook (4th ed. 2012) § 1.34, pp. 25-26 [trial judge should not sustain a hearsay objection when evidence has a relevant nonhearsay use, even if its probative value appears to be very slight].) Defendant contends George's reaction or state of mind after hearing the "187" statement shed no light on any issue in the case and that therefore Dominguez's statement should not have been admitted.

We conclude George's reaction to the statement was relevant to a disputed issue at trial, namely, how and why George came to be inside defendant's home and came to hear defendant make his "four vatos" statement. Trial counsel for all four defendants treated the "four vatos" statement as one of the most incriminating pieces of evidence against defendant. That this statement was made in front of

---

[27]  Defense counsel previously had made an unsuccessful objection to the prosecutor's reference to the "riding around with a 187" comment during the prosecutor's opening statement.

63

several witnesses, including defendant's own father, made it particularly important.**28** The parties engaged in detailed questioning of George's account of the sequence of events leading up to his hearing the "four vatos" statement, beginning with George's reaction to Dominguez's "187" comment. Much of the questioning focused on George's prior statements.

Before trial, George had been interviewed by an investigator who worked for the attorney representing George's brother. The interview was made available to all parties before trial and was played to the jury. In the interview, George recounted that, after Dominguez made the "187" comment, George realized defendant had committed the murder. Shocked, George ordered defendant out of his car. George parked at Dominguez's house, but became curious and walked back to defendant's house with Dominguez. Once in defendant's house, George and Dominguez heard defendant tell his father, "I ain't gonna let four vatos go down for some white boy."

Defendant acknowledges Dominguez's "187" comment might have been relevant to George's conduct if, as recounted in the investigator's interview, George ordered defendant out of his car after hearing it. Defendant argues the "187" statement was inadmissible because George's account during direct examination by the prosecutor differed from his statements in the earlier interview. George testified on direct examination that he did not order defendant out of his car, and that, after he parked, he, defendant, and Dominguez went directly to

---

**28**    Defendant's father, who had not been shown to be unavailable as a witness, was not called by the defense to refute George's account of what defendant had said. As noted previously, the prosecutor argued at both the guilt and penalty phases that the jury could infer from the defense's failure to call defendant's father that his testimony would have been adverse to defendant's position.

defendant's house. During cross-examination by counsel for one of the codefendants, George said his account in the interview was the correct one.

Whichever version the jury decided to credit (see Evid. Code, § 1235), George's reaction to the "187" statement was relevant because it related to the plausibility of George's account of the sequence of events resulting in his hearing defendant make the "four vatos" statement to defendant's father. We conclude the trial court did not err by admitting the "187" statement for a relevant nonhearsay purpose. (See 1 Jefferson, Cal. Evidence Benchbook, *supra*, § 1.36, p. 27.)

### 2. *Realization that Defendant was the Shooter*

George twice was permitted to testify over defendant's objection that, after hearing Dominguez's "187" remark, George realized defendant had been telling the truth about shooting Walker rather than just making up a story. Defendant contends this testimony was "implicitly a lay opinion about Dominguez'[s] veracity," and that "[l]ay opinion about the veracity of particular statements by another is inadmissible on that issue." (*People v. Melton* (1988) 44 Cal.3d 713, 744.)

As discussed above, Dominguez's "187" statement was not admitted for its truth but to explain George's conduct based on his reaction to the statement. That reaction, coming to believe defendant had shot Walker, and George's subsequent conduct, were relevant to how and why George came to be present when defendant made his "four vatos" statement to his father, a sequence of events about which George was closely questioned by all parties. We conclude the "187" statement was not admitted as lay opinion supporting the truth of Dominguez's statement.

### D. Objections to Portions of Kimberly Speck's Testimony

Kimberly Speck testified for the prosecution regarding defendant's actions the night of Varela's birthday party and the statements defendant made the following day concerning the murder. Defendant objected to certain testimony by Speck that he viewed as alluding to statements Varela had made to her that incriminated defendant. Defendant contends the admission of Speck's testimony over objection violated his *Aranda*/*Bruton* Sixth Amendment confrontation rights and state evidentiary principles concerning the admissibility of lay opinion. Alternatively, he claims the evidence should have been excluded under Evidence code section 352.

#### 1. Background

At the preliminary hearing, a police officer testified Varela had told the police that defendant was the one who shot Mark Walker. Speck testified at the same hearing that, during the morning after the shooting, Varela had told her defendant shot Walker. Before trial, defendant successfully challenged the admission of codefendant Varela's out-of-court statements concerning the shooting, as well as the prosecutor's proposed redacted version of Varela's statements, on the basis that they incriminated defendant and were barred under *Aranda*/*Bruton*. The court initially gave the prosecution the choice between severing Varela's trial from his codefendants or proceeding in a joint trial without using Varela's statements. The court ultimately approved a third option, empanelling a separate jury for Varela. Besides hearing the evidence the jury for defendant and the other codefendants had heard, Varela's separate jury additionally heard Varela's out-of-court statements to the police about the shooting.

On direct examination by the prosecutor, Speck testified Varela took his van's keys and left his own birthday party with defendant. When Varela returned

66

about 10 minutes later, he looked troubled. Based on something Varela told her, she and Varela went to a donut shop the morning after the party to buy a newspaper. They were looking for a report on a particular subject. Speck found what they were looking for, an article that said police had found a car off of Palisades Drive with a dead person in the back of it. When they returned to the apartment, Varela showed defendant the article. Defendant looked at it and then said to her, in a joking tone of voice, "Can you believe they're trying to pin this on me?" On cross-examination, Speck said that, when defendant made that remark, he also said, "Man I don't believe it, I didn't kill that kid."

On redirect examination, the prosecutor asked whether Speck had responded to defendant's statements. She stated she did not remember making any response. The trial court overruled a defense objection that the question had been asked and answered. The prosecutor then asked why Speck had not responded. She answered, "Because I knew." Defendant moved to strike that response on relevance and Evidence Code section 352 grounds. The trial court overruled the objection.

Outside the presence of the jury, defendant's counsel renewed his objection to the admissibility of the statement that Speck did not respond to defendant because she "knew." Counsel argued admission of this statement violated *Aranda/Bruton* because, by implication, it referred to a statement Varela had made to Speck indicating defendant had shot the victim. Defense counsel moved to have the statement stricken from the record or, alternatively, for a mistrial. The prosecutor said his questioning sought to explain Speck's actions in response to defendant's statements and were not offered for their truth, and therefore did not violate *Aranda/Bruton*. The trial court agreed with the prosecutor, finding defense counsel's interpretation of Speck's "because I knew" statement unreasonable. It denied defendant's motion to strike and motion for mistrial.

67

## 2. Analysis

### a. Aranda/Bruton

We are not persuaded by the People's contention that, because there was one jury for codefendant Varela and another for defendant and the other codefendants, there could be no *Aranda*/*Bruton* error based on Speck's statement. The only difference in the evidence heard by the two juries was with regard to Varela's out-of-court statements to police concerning the shooting. Speck's testimony was heard by both juries, and defendant contends Speck's "I knew" statement was tantamount to her saying, "Varela told me Montes killed Walker." However, Speck never testified to such an out-of-court statement, and her "I knew" statement was not tantamount to saying, "Varela told me Montes killed Walker."

"[A] defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant." (*Richardson v. Marsh* (1987) 481 U.S. 200, 207.) We conclude Speck's "I knew" statement is not facially incriminating; it does not name defendant or refer to him directly.

We similarly find meritless defendant's argument that the "I knew" statement is incriminating through inference based on Speck's other testimony. The class of inferentially incriminating statements under *Bruton* is limited to "obvious" ones, "inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial." (*Gray v. Maryland* (1998) 523 U.S. 185, 196.) Speck's "I knew" statement does not fall into the class of obvious inferences defined by *Gray*. The most that can be inferred from Speck's entire testimony is that, before they looked for the newspaper article, Varela told her something about defendant's involvement in the shooting. From Speck's testimony, the jury could not have inferred the specifics of what Varela told her

68

about defendant's involvement or whether defendant had been the shooter. We conclude the trial court did not err by denying defendant's motion to strike or his motion for mistrial under *Aranda/Bruton*.

### b. Inadmissible Lay Opinion

Defendant next contends the "I knew" statement was inadmissible because it implied Varela had told Speck defendant shot Walker and suggested she believed in the truth of Varela's statement. Defendant contends any testimony to the effect that Speck believed in the truth of Varela's statement was improper lay opinion. (*People v. Melton*, *supra*, 44 Cal.3d at p. 744.) The prosecutor's question did not ask Speck to assess the truth of any previous statements Varela made to her. Instead, it sought to determine how Speck perceived and reacted to defendant's comments about his lack of involvement in the shooting mentioned in the article. Her perception of his denial as a joking statement, rather than a credible and sincere denial, and her lack of a response were relevant to establishing that point.

### c. Relevance and Evidence Code Section 352

Defendant additionally contends the trial court should have sustained his objection to the "I knew" statement on relevance and Evidence Code section 352 grounds. As discussed above, the statement was relevant for the purpose of explaining how Speck perceived and reacted to defendant's comments about his lack of involvement in the shooting mentioned in the article. Her brief remark had little potential harmful effect to defendant. She did not elaborate upon how she "knew" defendant was involved. As discussed above, the trial court had excluded from defendant's jury any evidence regarding Varela's statement to Speck implicating defendant. As to an Evidence Code section 352 objection, a trial court's discretionary ruling under that statute " ' "must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary,

capricious or patently absurd manner that resulted in a manifest miscarriage of justice.  [Citations.]" ' "  (*People v. Williams* (2008) 43 Cal.4th 584, 634-635.) We discern no abuse of discretion in the trial court's ruling.

### E.  Exclusion of Gallegos's Statements That He Knew the Victim

Defendant sought to introduce codefendant Gallegos's statements to the police that Gallegos had known the victim and had played football with him for several years.  In response to Gallegos's objection, the trial court excluded the statements as irrelevant and, alternatively, as inadmissible under Evidence Code 352.  Defendant contends the trial court abused its discretion in excluding Gallegos's statements.

#### 1.  Background

Defendant moved to admit Gallegos's statements made to Detective Anderson during an interview as party statements under Evidence Code section 1220.  Defendant offered the statements to show Gallegos had a motive to kill Walker to prevent him from identifying Gallegos as one of the carjackers. Pursuant to Evidence Code section 352, counsel for Gallegos sought to exclude the statements, arguing their admission would force him to disprove the statements.  He said he would do so by subpoenaing people from Gallegos's high school who would testify Gallegos and Walker went to different high schools to show Gallegos had not played football at Walker's high school.  Counsel for Gallegos added that he also would call Walker's mother and friends to testify they did not know Gallegos.

The trial court excluded Gallegos's statements as irrelevant to motive.  It found they were not admissible under any exception to the hearsay rule.  It also excluded the statements under Evidence Code section 352, finding them substantially more prejudicial than probative.

70

## 2. Analysis

Assuming Gallegos's statements claiming acquaintance with Walker were admissible under Evidence Code section 1220 and were relevant to show Gallegos had a possible motive to kill Walker, we conclude the trial court did not abuse its discretion in excluding the statements under Evidence Code 352.  Defendant has not shown that the trial court " ' "exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Williams*, *supra*, 43 Cal.4th at pp. 634-635.)  Here, the court had been advised by counsel for Gallegos that, if Gallegos's statements were admitted, he would call witnesses to testify that Gallegos did not go to Walker's school, that Gallegos never played football on Walker's school team, and that Gallegos was unknown to Walker's friends and family.  It was probable the excluded testimony would have necessitated an "undue consumption of time" on a collateral issue and would have created substantial danger of "confusing the issues, or of misleading the jury." (Evid. Code, § 352.)  As Gallegos counsel's argued, Gallegos's statements to Detective Anderson that he knew Walker and played football with him for several years appeared to be a misguided attempt to exculpate himself in the hope he would be released by the police.  We find no abuse of discretion in the trial court's exclusion of Gallegos's statements under Evidence Code section 352.

### F.  Asserted Prosecutorial Misconduct

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)  Here, we consider defendant's claim that the prosecutor committed

71

prejudicial misconduct at the guilt phase by improperly vouching for Kimberly Speck's testimony in closing argument.

Speck testified defendant had made incriminating admissions. During cross-examination by defense counsel, Speck stated that two years before her testimony, she had been arrested for being under the influence of drugs and had agreed to attend a drug diversion program. She said she had failed to attend the program, and had failed to appear in court for a traffic citation, but that, in the week before her testimony at defendant's trial, the prosecutor went to court with her to help her get reinstated to the drug diversion program and to help her obtain a dismissal of her traffic citation. In closing argument, defense counsel argued Speck had lied in her testimony because she received a deal from the prosecutor in these matters.

In his rebuttal, the prosecutor addressed this defense argument by arguing the jury could determine Speck was not lying because she had made the same statements about defendant before she received her deal. The prosecutor also argued the disposition Speck received for her citation was what she would have received had she not failed to appear. Defense counsel objected that the prosecutor had misstated the facts and asked for an admonition. The trial court sustained the objection and said it would give an appropriate admonition at a later time. At the conclusion of the prosecutor's rebuttal, the court gave a general admonition that arguments of the attorneys were not evidence, that jurors are the sole judges of what had been proven by the evidence, and that if their recollection of the evidence differed from what the attorneys said in argument, they should follow their own recollection.

Defendant contends he was prejudiced by the prosecutor's reference to facts not in the record because the improper argument vouched for Speck's credibility. We disagree. The trial court properly sustained defendant's objection to the statement, and later admonished the jury to disregard the arguments of counsel if

72

not supported by the evidence. Defendant's claim that this admonishment was too general and too removed from his specific objection is unpersuasive. In any event, the prosecutor's argument for Speck's credibility mainly was predicated on the fact that Speck had made the same statements incriminating defendant before and after the deal she received in her own case. We conclude there was no prejudice from the prosecutor's brief reference to a fact outside the record.

### G. Discharge of Two Jurors

The trial court discharged Juror No. 7 near the conclusion of the guilt phase. It discharged that juror's replacement, Alternate Juror No. 2, after the guilty verdicts were rendered but before the penalty phase began. Defendant contends the trial court discharged the jurors without good cause and thereby violated his right to a trial by jury and to due process of law under the Sixth and Fourteenth Amendments to the United States Constitution.

"If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged . . . ." (§ 1089.) Removal of a juror under section 1089 is committed to the discretion of the trial court, and we review such decisions by asking whether the grounds for such removal appear in the record as a " 'demonstrable reality.' " (*People v. Cleveland* (2001) 25 Cal.4th 466, 474; see *People v. Wilson* (2008) 44 Cal.4th 758, 821.)

#### 1. Juror No. 7

##### a. Background

On September 30, 1996, midway through the guilt phase, Juror No. 7 informed the trial court he had been denied unemployment payments he had

73

expected to receive during the time he served as a juror. Outside the presence of the jury, Juror No. 7 said he wished to remain as a juror, and the trial court agreed to make scheduling accommodations the juror requested to pursue job interviews.

On October 30, 1996, the bailiff informed the trial court that some jurors had reported that Juror No. 7 had been looking at flash cards during witness testimony. Questioned by the court, Juror No. 7 stated he had flash cards on medical terminology for a class in which he had an upcoming test. He claimed he had paid attention to the trial testimony and had looked at the cards only when a witness used the term "enzyme." The court admonished him not to consult his flash cards or any other outside source of information.

The prosecutor moved to excuse Juror No. 7 based on his inattention during witness testimony. Another juror, Juror V., told the court Juror No. 7 had been reviewing flash cards during over two hours of witness testimony. The trial court denied the prosecutor's request to excuse Juror No. 7.

The next day, the prosecutor renewed his concerns about Juror No. 7, stating that the juror had made loud noises and acted in a disruptive manner during witness testimony. The bailiff said Juror No. 7 was snorting and constantly moving around. The court acknowledged Juror No. 7 had exhibited some idiosyncratic behavior, and agreed to watch him more carefully. On November 4, 1996, the prosecutor again unsuccessfully moved to remove Juror No. 7 based on the flash card incident and his contention that Juror No. 7 had not taken any notes in court.

On November 13, 1996, the day closing arguments began, Juror No. 7 told the court he had received an offer of employment scheduled to start five days later. When the trial court said the case could go to a penalty phase that likely would not conclude until December 6, Juror No. 7 said he had not been aware of that possibility.

During a recess, the trial court called the employer, who confirmed Juror No. 7 was to start training in five days. Although the employer preferred that start date, the company was willing to postpone the juror's start date for an additional week. Counsel for defendant and the codefendants asked that Juror No. 7 remain on the jury through the guilt deliberations. The prosecutor argued Juror No. 7 should be excused because the employer's deadline could affect the juror's guilt phase deliberations. The trial court took the matter under submission.

At a further hearing that afternoon, the prosecutor renewed his motion to remove Juror No. 7 on the grounds previously stated. The court asked Juror No. 7 whether he would suffer financial hardship from losing a week's pay by starting his new job a week later than expected. Juror No. 7 said the delayed start was manageable, but he could not serve beyond November 25, 1996.

The trial court found that good cause existed for immediately dismissing Juror No. 7, and that the November 25 employment start date would create an "atmosphere of time urgency" that would substantially impair the juror's ability to perform his duties. The court alternatively found good cause for the dismissal based on misconduct when the juror had read the enzyme flash card, and for his perceived "inattentiveness" and "erratic and questionable behavior." The jury subsequently rendered guilt phase verdicts on November 22, 1996.

### b. Analysis

Defendant contends the trial court abused its discretion by dismissing Juror No. 7. He argues the record did not support the court's finding that the impending employment date would affect Juror No. 7's ability to deliberate because the court failed to question the juror further on his ability to remain fair and impartial during deliberations despite the impending employment date. However, as the trial court noted, Juror No. 7 already had stated his desire to stay on the jury until his work

75

began. Therefore, it was unnecessary to question him further regarding his subjective belief as to what effect the employment deadline would have on him. The trial court properly considered that Juror No. 7 knew the date beyond which he could no longer serve and the objective effect of that impending deadline. The court correctly recognized the impending employment date could consciously or unconsciously pressure Juror No. 7 to try to conclude the guilt phase deliberations within his time frame, and that the deadline could create an atmosphere of urgency. (See *People v. Gurule*, *supra*, 28 Cal.4th at p. 632 [the trial court " 'should refrain from placing specific time pressure on a deliberating jury' "].) Regardless of Juror No. 7's subjective intent, we are "confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied" (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1053), and that the grounds for the removal appear in the record as a demonstrable reality. (*People v. Wilson*, *supra*, 44 Cal.4th at p. 821.)

The fact that the guilt phase deliberations concluded three days before Juror No. 7 would have had to report to his new job does not call into doubt the correctness of the trial court's ruling. At the time of the ruling, the trial court could not have known with certainty when the jury would complete its guilt phase deliberations. It properly reached its decision based on the information before it. Because we find no error in the trial court's determination of good cause based on time pressure, we need not review the trial court's alternative basis for the ruling based on the juror's alleged inattentive and disruptive behavior.

### 2. *Alternate Juror No. 2*

#### a. *Background*

Alternate Juror No. 2 took the place of Juror No. 7, and participated in the guilt phase deliberations and verdicts. Before the penalty phase, the bailiff

76

informed the trial court the alternate juror wished to discuss being relieved as a juror. In the presence of defense counsel and the prosecutor, the trial court discussed the matter with Alternate Juror No. 2. She stated she had been having nightmares throughout the trial but had thought she would be strong enough to complete it. She now believed she did not have the mental strength to do so. She could not get the faces of the victim and the defendants out of her mind. She had spent the previous week in bed feeling sick and depressed, and she was having trouble sleeping. Although she believed there was overwhelming evidence of guilt and she had made the right decisions in her guilt phase deliberations, she stated that she could not vote for the death penalty.

The defense objected to excusing Alternate Juror No. 2, arguing it might be the evidence in the case, not personal incapacity, that led to her expressed inability to impose the death penalty. The trial court excused Alternate Juror No. 2, finding her ability to function as a juror was substantially impaired.

### b. Analysis

Defendant contends the trial court did not question Alternate Juror No. 2 sufficiently to determine the basis of her stated inability to sentence defendant to death. He argues the record does not establish to a demonstrable reality that her stated inability to sentence defendant to death was based on an absolute inability to impose a death sentence, rather than her view, based on the guilt phase evidence, that death was not the appropriate punishment for defendant. The record does not support defendant's argument. Alternate Juror No. 2's description of her mental anguish was not focused on lingering doubt from her guilt phase verdict as to defendant. Rather, she mentioned being haunted by the faces of both the victim and the defendants. She believed there was overwhelming evidence supporting her guilt phase verdict, but her anguished mental state prevented her from being

77

able to impose a sentence of death. The grounds for her removal exist in the record as a demonstrable reality. (*People v. Barnwell*, *supra*, 41 Cal.4th at p. 1053.)

## H.  Kidnapping Special Circumstance as a Lesser Included Offense

The jury found true all three special circumstances alleged against defendant: murder in the commission of (1) a robbery (§ 190.2, former subd. (a)(17)(i), now subd. (a)(17)(A)); (2) a kidnapping for robbery (*id*., former subd. (a)(17)(ii), now subd. (a)(17)(B)); and (3) a kidnapping (*ibid*.). The substantive offense of simple kidnapping is a lesser included offense of kidnapping for robbery. (*People v. Lewis*, *supra*, 43 Cal.4th at p. 518.) Defendant contends the simple kidnapping special circumstance should be reversed because multiple convictions may not be based on necessarily included offenses arising out of a single act or course of conduct. He then argues the death judgment must be reversed because the jury wrongly considered three, rather than two, special circumstances at the penalty phase. He claims the inclusion of the third special circumstance allegation made a death sentence more likely.

"In California, a single act or course of conduct by a defendant can lead to convictions 'of *any number* of the offenses charged.' [Citations.] . . . [A] judicially created exception to this rule prohibits multiple convictions based on necessarily included offenses. [Citations.]" (*People v. Montoya* (2004) 33 Cal.4th 1031, 1034.) But defendant cites no case in which a special circumstance finding has been reversed for being necessarily included within another special circumstance. He provides no reason for bringing special circumstances under the necessarily included offense rule beyond the unfounded assumption that special circumstances should be treated as being identical to criminal offenses in all contexts. We have stated, however, that "special circumstances are *sui generis* —

78

neither a crime, an enhancement, nor a sentencing factor." (*People v. Garcia* (1984) 36 Cal.3d 539, 552.) The penalty consequence of a true finding on a special circumstance allegation is that a defendant becomes eligible for the death penalty. (See § 190.2; *Brown v. Sanders* (2006) 546 U.S. 212, 221.) Defendant became eligible for the death penalty on the basis of the jury's finding true either of the two special circumstances not challenged on appeal. He faced no additional punishment merely as a result of the finding on the simple kidnapping special circumstance allegation. Therefore, because special circumstances are a unique class created by statute (§ 190.2), we decline to extend to them a judicially created rule that has previously been applied only to crimes. Accordingly, we will not modify the judgment to strike the simple kidnapping special circumstance nor overturn the penalty judgment on this basis.

Additionally and independently of his argument that the necessarily included offense rule applies to special circumstances, defendant contends that the simple kidnapping special circumstance violated his constitutional rights because it "artificially inflated" the number of special circumstances for the jury to weigh against him at the penalty phase. We have addressed similar arguments in the context of multiple felony-murder special circumstances that "might artificially inflate the weight to be given the underlying offenses as aggravating factors if considered more than once for exactly the same purpose . . . ." (*People v. Bean* (1988) 46 Cal.3d 919, 955.) We reject defendant's claim here for the same reason expressed in *People v. Bean*: "[N]othing in the record suggests that the jury in this case might have been led by the court's instructions to simply count the special circumstances and weigh them mechanically rather than consider the nature of the conduct underlying those special circumstances." (*Ibid*.) Nor did the prosecutor urge the jurors to "double count" the simple kidnapping special circumstance against defendant. (*People v. Melton* (1988) 44 Cal.3d 713, 769.) We therefore

79

conclude that defendant's constitutional rights were not violated because of the simple kidnapping special circumstance.

## I. Asserted Failure to Limit CALJIC No. 2.15 to Theft-related Offenses

Defendant's jury was instructed with CALJIC No. 2.15, which permits an inference of guilt of a theft-related offense based on a defendant's possession of recently stolen property, but only if the theft-related offense is corroborated by other evidence.  Defendant contends the trial court erred in giving CALJIC No. 2.15 without limiting it to the theft offenses.  Although he did not object below to the giving of the instruction on this precise ground, we assume the claim is preserved for appeal.  (See *People v. Moore* (2011) 51 Cal.4th 1104, 1130.)  We find the trial court erred, but the error was harmless.

As relevant here, the trial court instructed with CALJIC No. 2.15, as follows: "If you find that the defendant was in conscious possession of recently stolen property, the fact of such possession is not by itself sufficient to permit an inference that the defendant is guilty *of the crimes or the allegations as charged in the Amended Information*.  Before guilt may be inferred, there must be corroborating evidence tending to prove the defendant's guilt.  However, this corroborating evidence need only be slight and need not by itself be sufficient to warrant an inference of guilt."  (Italics added.)

We have held it is error for a court to instruct the jury with CALJIC No. 2.15 for nontheft offenses.  (*People v. Prieto* (2003) 30 Cal.4th 226, 249.)  Defendant contends the jury could have understood the instruction to mean only slight corroboration was needed to find defendant guilty of all the charged offenses, including the nontheft offense of murder and the attendant special circumstances. We previously have rejected defendant's argument that the instructional error had the effect of relieving the prosecution of its burden of proving defendant guilty of

80

the charges beyond a reasonable doubt, and thus violating his rights to due process and to a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. "[T]he error is one of state law only, subject to the miscarriage of justice test under *People v. Watson* (1956) 46 Cal.2d 818, 836, 299 P.2d 243 (*Watson* ) — whether defendant has established there exists a reasonable probability he would have obtained a more favorable result if the error had not occurred." (*People v. Moore*, *supra*, 51 Cal.4th at p. 1130.)

Here, there was no reasonable probability the jury would have reached a different result had the court limited the permissive inferences described in CALJIC No. 2.15 to theft offenses. Although the instruction mentioned "the crimes or the allegations as charged in the Amended Information," it is unclear whether the jury would have applied the instruction to anything but the theft-related offenses, given that they were the offenses to which the instruction most clearly related. Defendant's claim to the contrary, the prosecutor's references to CALJIC No. 2.15 did not direct the jury to improperly apply the "slight corroboration" requirement. Instead, the prosecutor reviewed evidence that supported the theory that the murder was committed during the commission of robbery or carjacking, each of which has a theft element to which the "slight corroboration" requirement of CALJIC No. 2.15 was applicable. Therefore, the prosecutor properly asked the jury to apply CALJIC No. 2.15 to the circumstances related to the theft elements of robbery or carjacking, that would, in turn, support a theory of felony murder.

In any event, in view of the overwhelming evidence of defendant's guilt and the panoply of other instructions that correctly guided the jury's consideration of the evidence, we find no reasonable likelihood of a more favorable outcome for defendant had the instruction not been given. (*People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 101.)

81

## A. Victim Impact Evidence

### 1. *Challenge to Victim Impact Evidence as Unforeseeable*

Victim impact evidence is admitted under section 190.3, factor (a) ("circumstances of the crime"). (*People v. Harris* (2005) 37 Cal.4th 310, 351 (*Harris*).) Defendant contends that to avoid being unconstitutionally overbroad and vague, such evidence should be limited to effects known or reasonably apparent to him at the time he committed the crime or effects that properly were introduced to prove the charges at the guilt phase. He objects to the victim impact evidence that presented details of the victim's entire life, none of which defendant could have known when the murder was committed. He also objects to family members' descriptions of their emotional anguish following the victim's death, including painful incidents defendant could not reasonably have anticipated. We have rejected similar arguments (*People v. Boyette* (2002) 29 Cal.4th 381, 445, fn. 12), and we reject defendant's invitation to revisit our prior rulings on this issue.

### 2. *Failure to Hold an In Limine Hearing with Live Testimony*

Defendant moved to exclude victim impact evidence under Evidence Code section 352 and claimed its admission violated his state and federal due process rights. He objected to any testimony by the victim's family about the circumstances of the crimes, and asked the trial court to conduct an Evidence Code section 402 hearing in which the prosecutor would be required to present live testimony of each proposed prosecution witness. The trial court denied the Evidence Code section 352 objection and refused to conduct a hearing with live witnesses, ruling that family members could testify regarding the circumstances of the murder and how that crime had affected them. It reviewed with defense

counsel letters family members had submitted to the prosecutor and an outline of questions the prosecutor planned to ask them.

Defendant cites no authority compelling the trial court to hold a hearing previewing the live testimony of victim impact witnesses, and his discussion of law in other states that require detailed pretrial disclosure of proposed victim impact testimony does not convince us to adopt such a requirement. Here, the trial court considered the proposed testimony by reviewing the written statements of the proposed victim impact witnesses. Defendant contends this review did not anticipate all of the testimony presented. He points to the mother's testimony regarding the vandalism of her son's grave, contending that testimony was so emotionally charged his counsel could not effectively object to it in front of the jury. Defendant claims he suffered particular prejudice because this testimony was not previewed.

The victim's mother's testimony on the grave vandalism incident is discussed immediately below in connection with defendant's motion for mistrial based on the victim impact evidence. For the reasons discussed there, we find no error in the admission of the grave vandalism testimony. Consequently, we conclude that no prejudice resulted from the denial of defendant's request to preview the victim impact testimony.

### 3. Testimony Describing the Vandalism of the Victim's Grave Site

#### a. Background

The victim's relatives submitted letters to the prosecutor describing testimony they intended to give at the penalty stage. The defense objected to the portion of the letter submitted by Judith Walker Koahou, the victim's mother, in which she said the defendants had killed her son for no reason and that if they were allowed back into society they would kill again. Defendant also objected to

the following comment in that letter regarding the vandalism of Walker's grave: "Their violence towards our family has not stopped. The family members who are still living in Beaumont vandalized Mark's grave. They broke the bench that was at his grave. They spread rumors all over town. It seems that they are hoping to push us into doing something back to them. They are trying to intimidate us." The court told the prosecutor to caution his witnesses against making such statements during testimony, and the prosecutor indicated he would not go into this area in his questioning, but the parties and the court did not specifically discuss the grave vandalism incident mentioned in the mother's letter.

When the mother testified, the prosecutor asked how her son's murder had affected her and whether she often went to the cemetery to visit his grave. She responded she had a difficult time doing so because his grave site had been vandalized, its memorial bench had been broken, and the gravestone had been spray-painted with graffiti. She said she had removed the broken bench and had had the gravestone sealed with anti-graffiti sealant, but she still found it difficult to go to the cemetery because of the shock of the vandalism.

Defense counsel did not object to this testimony at the time, but raised it as part of the motion for mistrial made at the conclusion of the victim impact testimony. Counsel contended the mother's grave vandalism testimony was inadmissible because it was inflammatory under Evidence Code section 352. He argued the testimony raised the element of gang terrorism, and it allowed the jury to hold defendant responsible for the impact of other people's actions on the family while defendant was incarcerated. In response, the prosecutor noted that the mother had not identified who had vandalized the gravestone, and he indicated that he was not going to argue defendant was responsible for this act.

In denying the mistrial motion, the trial court ruled the mother's grave vandalism testimony was relevant and admissible, noting that the mother had not

84

blamed any particular person for the vandalism, but simply described its effect on her. Observing it was common to hear about cemeteries being vandalized, the court concluded the testimony was not unduly prejudicial under Evidence Code section 352, and that, had defense counsel objected to it at the time, it would have ruled the testimony admissible.

### b. Analysis

Assuming for the sake of argument that defendant's claim regarding the admissibility of the grave vandalism testimony has not been forfeited, we reject it on the merits. "Under California law, victim impact evidence is generally admissible as a circumstance of the crime pursuant to section 190.3 factor (a)." (*Harris*, *supra*, 37 Cal.4th at p. 351.) In *Harris*, we characterized as "too remote from any act by defendant to be relevant to his moral culpability" (*id*. at p. 352) challenged testimony that described how, during a victim's funeral, the casket lid accidentally opened as it was being placed in the hearse, which caused several funeral attendees to scream and faint and one to fall on the partially opened casket. Defendant contends the vandalism of the victim's grave, like the casket incident in *Harris*, was too remote from any act by defendant to have been relevant, and that the testimony was prejudicial because the reference to graffiti implied gang involvement, which presented a risk the jurors would blame defendant for the act of vandalism despite the lack of evidence of his involvement.

Unlike the unique funeral incident described in *Harris*, instances of vandalism at cemeteries are not uncommon. We conclude the mother's testimony about the vandalism fell within the traditional sphere of victim impact testimony in describing the effects of the crime on the relatives of the victim. Furthermore, we reject defendant's assertion that the mother's testimony implied gang involvement. In her letter, which was not presented to the jury, the mother connected the

vandalism to gangs, but she made no such connection during her testimony. Instead, she described the incident in terms of the impact it had on her life, as one more instance of suffering among many caused by her son's murder. The trial court did not, therefore, abuse its discretion in concluding that the probative value of the evidence was not outweighed by the danger of undue prejudice. Finally, even assuming for the sake of argument that the admission of the vandalism testimony was erroneous, we conclude it was harmless beyond a reasonable doubt when considered in the context of all of the penalty phase evidence presented. (*Chapman v. California* (1967) 386 U.S. 18, 36; *Harris*, *supra*, 37 Cal.4th at p. 352.)

### 4. *Victim Impact Testimony as Improper Opinion Evidence*

Defendant contends the testimony of the victim's relatives should have been excluded as improper opinion evidence. Assuming for the sake of argument that this claim was not forfeited on appeal for failure to object below to the victim impact testimony on these precise grounds, the contention fails on its merits.

As the basis of this claim, defendant points to instances where the prosecutor asked family members some version of the question of how the circumstances of Walker's death — having been carjacked, thrown in his car's trunk, and shot— caused them grief in a way that was different from grief they would have experienced had he died from an accident or a disease. Each relative testified the unexpected and abrupt nature of his death made it especially painful. Defendant contends this testimony violated *Booth v. Maryland*, *supra*, 482 U.S. at pp. 502-503, 508-509 (overruled in part by *Payne*, *supra*, 501 U.S. at p. 829), because it contained lay opinion about the circumstances of the crime. As additional authority, defendant cites Justice Moreno's concurring opinion in *People v. Robinson* (2005) 37 Cal.4th 592, which criticized the admission of testimony that

86

"allowed the parent of the victim to invoke an imagined version of the crime, the version that was the most horrific, and that was in alignment with the prosecutor's theory of the murders." (*Id.* at p. 657 (conc. opn. of Moreno, J).)

Here, in contrast to the testimony criticized in the *Robinson* concurrence, the circumstances of Walker's murder as summarized by the prosecutor were undisputed, and the testimony focused primarily on the impact of the crime on each family member rather than dwelling on or emphasizing the circumstances of the crime itself. We find no error in the trial court's admission of this aspect of the victim impact testimony.

### 5. *Testimony on Passage of Time and Frustration with the Delay*

The victim's brother, Scott, testified about the anguish and anger he had felt since the murder. Asked whether he thought things would get better, he said he had not been able to rest for two years because each court date made him relive the murder. Scott added, "[A]fter this is over, [we] still got everything else down the road." As part of the motion for mistrial based on the victim impact evidence, defense counsel contended this statement appeared to be an improper reference to the outcome of the present proceeding and to future appellate review. The trial court rejected this argument, noting that any reasonable juror would have understood the statement as referring to how the pending nature of the trial had affected Scott's grief.

Although his counsel did not object during the testimony, defendant contends the issue has been preserved for appeal because defense counsel explained to the trial court that he hesitated to make objections during the testimony of family members due to the emotional atmosphere of the courtroom. We have stated that failure to object "may not be excused on the ground that a timely objection would be inconvenient or because of concerns about how jurors might perceive the

87

objection." (*People v. Pollock* (2004) 32 Cal.4th 1153, 1181.)  In any event, even if the claim were not forfeited, we would reject it on its merits.

In *People v. Ramos* (1984) 37 Cal.3d 136, 155-158, we found error when the trial court instructed a penalty phase jury to consider the possibility the Governor could commute a life sentence imposed by the jury because the instruction could lessen the jurors' sense of personal responsibility for the verdict or induce them to attempt to preempt an exercise of that authority.  Defendant contends the reference to "everything down the road" was analogous to informing the jury about the commutation power of the Governor.  We disagree. We conclude Scott's reference to "everything down the road" was a vague reference to dealing with his grief in the future.  We agree with the trial court that no reasonable juror would have interpreted the remark as a reference to future appellate proceedings or to the possible commutation of defendant's sentence.

### 6. *Testimony Comparing the Victim's Life to Others*

The prosecutor's last question to the victim's mother invited her to add anything else she wanted to say about her son or the impact of his murder on the family.  In response, the mother described how, at 16 years old, her son already had become a productive member of society with a job, car, and bank account. She concluded, "Mark walked down a road that wasn't an easy road.  He came from a dysfunctional family.  He went to a private school and had to go to a public school.  He went through divorce.  He went through poverty for the first several months after Jack and I broke up.  We didn't have a lot of money.  We never did really have what I would consider a lot of money.  We were comfortable.  But he made proper choices.  When he came to that fork in the road that goes right or wrong, he chose right consistently."

Defense counsel did not object to the testimony at the time, but argued in his mistrial motion that this closing statement was less a description of her son's life than a "pre-planned" closing argument. In denying the mistrial motion, the trial court characterized the statement as the culmination of the two years the mother had to think about how to express her grief and articulate how the loss of her son had affected her family.

On appeal, defendant contends the mother's statement improperly anticipated much of the defense's penalty phase evidence about defendant's childhood problems, including his educational challenges and the disruption caused by his parent's divorce. He argues the statement drew improper comparisons between the lives of the victim and of defendant.

We reject defendant's contentions as unsupported by the record. If, coincidentally, some parallels existed between the lives of the victim and of defendant, the mother's testimony did not expressly connect them, and defendant does not point to any comments by the prosecutor that invited such a comparison. The testimony was relevant and admissible as evidence showing the victim to be an individual whose death represented a unique loss to society in general and to his family in particular. (*People v. Prince*, *supra*, 40 Cal.4th at p. 1286.)

### 7. The Videotape

#### a. Background

The prosecutor presented a 10 1/2 minute videotape with an instrumental soundtrack. Approximately 115 still photographs depicted the victim from infancy until he was killed at age 16. It concluded with an image of a snow covered road followed by a photograph of his memorial plaque. The version of the video previewed by the court and the parties outside the presence of the jury had been 16 to 17 minutes long and had included Walker's favorite songs,

89

including "Fire and Rain" by James Taylor.  Defense counsel objected to the emotional effect of the songs and the religious references in two of them.  The trial court found the video images admissible but agreed that the music magnified their emotional impact and caused the videotape to be substantially more prejudicial than probative.  The court suggested the prosecutor should restrict himself to "Muzak-type" background if he wanted to use music.  The prosecutor subsequently shortened the tape and substituted an instrumental track with no apparent songs or recognizable themes.  While conceding the new music was not as emotional as the previous songs, defense counsel again objected to the use of music.  After reviewing the edited videotape, the trial court overruled the objection, finding the simple piano music did not add materially to the emotional effect of the videotape, and that its probative value outweighed any prejudicial effect.

### b. Analysis

In assessing the admissibility of certain victim impact evidence, trial courts "must not permit irrelevant background music or video techniques that enhance the emotion of the factual presentation," and the videotape, "even when presented factually, must not be unduly emotional."  (*People v. Kelly* (2007) 42 Cal.4th 763, 798.)  Relying on *Kelly*, defendant contends the challenged videotape violated these principles because its dramatic effect was enhanced by the accompanying music.  We have reviewed the tape, and we agree with the trial court that the music used did not add materially to its emotional effect.

For the first time on appeal, defendant contends the videotape contains an image that improperly enhanced its emotional impact, namely, the image of a prone body among photographs of the victim as an infant and young child.  Trial counsel did not object to the photographs in the video, only to the musical

90

component, and the prone figure was not mentioned during the mistrial motion. Defendant's claim based on this single image is forfeited for failure to object below. (*People v. Frye*, *supra*, 18 Cal.4th at pp. 969-970.)

In any event, we also reject this claim on its merits. We have reviewed the videotape and taken note of the photograph to which defendant refers. It depicts two people lying on a trampoline, one of whom presumably is the victim, as this apparently was an athletic activity he enjoyed. The image flashes by quickly and might have been confusing to a viewer, but we can ascribe no particular significance to it, especially because we do not know how the image appeared when the jury viewed it with the courtroom equipment. Defendant does not contend, nor do we perceive, that the image was part of an effort to manipulate the jury's emotions. The fact it was not raised or discussed by the parties during trial suggests it was not particularly notable. Under these circumstances, we conclude that the trial court did not err in admitting the image, and that, in any event, the inclusion of the image in the videotape was not prejudicial.

### 8. *Excessive Amount of Victim Impact Evidence*

Defense counsel unsuccessfully moved to have the trial court limit the number of victim impact witnesses to a maximum of two. Defendant contends the victim impact evidence was excessive because four victim impact witnesses testified, and the prosecution played a lengthy videotape that depicted the victim and his family. Defendant contends victim impact evidence should be limited to testimony from a single witness, citing as an example the testimony of the grandmother in *Payne*, *supra*, 501 U.S. at pages 814-815, the United States Supreme Court case finding the use of victim impact testimony constitutional. Defendant asserts that two states, New Jersey and Illinois, have instituted such a rule by judicial decision and by statute, respectively.

91

"This court previously has rejected arguments 'that victim impact evidence must be confined to what is provided by a single witness' [citation] . . . ." (*People v. McKinnon* (2011) 52 Cal.4th 610, 690.) *Payne* does not impose a constitutional limitation on the number of impact witnesses. The statutes and case law of other states are not binding on us. (See *People v. Hartsch* (2010) 49 Cal.4th 472, 509.) Under *Payne*, victim impact testimony is unconstitutional when it is "so unduly prejudicial that it renders the trial fundamentally unfair . . . ." (*Payne*, *supra*, 501 U.S. at p. 825.) We conclude the victim impact evidence in defendant's case did not violate this constitutional standard.

### 9. *Cumulative Error as to the Victim Impact Evidence*

In the event we do not find any one of his claims concerning the victim impact evidence constitutes reversible error in isolation, defendant contends the cumulative impact of this evidence was unduly prejudicial and was likely to provoke irrational, capricious, or purely emotional responses from the jury. We have found no reversible error in the individual claims, and we do not find reversible error by considering the claims cumulatively.

### 10. *The Mistrial Motion*

Defendant contends the trial court abused its discretion by denying his motion for mistrial based on the victim impact evidence. (*People v. Cox* (2003) 30 Cal.4th 916, 953 [denial of mistrial motion is reviewed under an abuse of discretion standard].) He points to the grave vandalism testimony and the videotape montage as constituting incurably prejudicial evidence that required a mistrial. Having found no reversible error in the admission of the victim impact evidence, we find no abuse of discretion in the trial court's denial of defendant's motion for mistrial based on that evidence.

*11. Refusal to Give a Defense Instruction on Victim Impact Evidence*

Defense counsel requested the jury be instructed that "[e]vidence has been introduced for the purpose of showing the specific harm caused by the crime as part of the circumstances of the offense factor. Such evidence was not received and may not be considered by you to divert your attention from your proper role of deciding whether Mr. Montes should live or die. You must face this obligation soberly and rationally, and you may not impose the ultimate sanction as a result of an irrational, purely subjective response to emotional evidence and argument." The trial court declined to give the proposed instruction, finding it argumentative, duplicative of other instructions, and potentially misleading.

We held in *People v. Zamudio* (2008) 43 Cal.4th 327, that the trial court did not err by refusing to give a proposed instruction substantially similar to the proposed instruction rejected here. The proposed instruction in *Zamudio* contained this additional sentence at the end: " 'On the other hand, evidence and argument on emotional though relevant subjects may provide legitimate reasons to sway the jury to show mercy.' " (*Id*. at p. 368.) The absence of that sentence in defendant's version makes it no less subject to criticism that it was "misleading to the extent it indicates that emotions may play no part in a juror's decision to opt for the death penalty." (*Ibid*.) For the reasons discussed in *Zamudio*, we conclude the trial court did not err in refusing to instruct the jury with the quoted proposed instruction. We decline defendant's request to reconsider our ruling in *Zamudio*.

**B. Prosecutorial Misconduct**

Defendant contends the prosecutor committed misconduct during the penalty phase. As we discuss below, none of the cited instances rises to the level of prosecutorial misconduct or constitutes reversible error.

93

### 1. Reference to the Jail's Maximum Security Area

Although the trial court had made an in limine ruling that witnesses should not mention that defendant's cell was in the maximum security area of the jail, a deputy correctional officer mentioned that fact in passing during his testimony about a search of defendant's cell that uncovered a weapon. Defendant forfeited any claim of misconduct based on that remark by failing to object below or to seek a jury admonition. (*People v. Frye*, *supra*, 18 Cal.4th at pp. 969-970.)

In any event, there was no misconduct. The prosecutor's question to the correctional officer was proper because it was not inherently likely to elicit a reference to the disclosed fact and there was no evidence the prosecutor asked it with the intent to elicit such a reference. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1405.) In that regard, we noted that the prosecutor did not refer to the disclosed fact in further questioning of the witness or in closing argument.

### 2. Questioning Concerning Additional Mental Tests

Defendant contends that, despite the prosecutor's assurance he would not pursue such a line of inquiry, the prosecutor's questions to the doctor who administered defendant's I.Q. tests improperly implied defendant had been prepped for the test. The prosecutor's questions concerned whether the doctor had given defendant additional tests related to I.Q. or brain damage. We conclude they did not necessarily imply that defendant had been prepped for the I.Q. test. Accordingly, we reject defendant's contention that this line of questioning was improper. In any event, defendant fails to show prejudice as to those questions because the trial court sustained some of his objections to them as not relevant and beyond the permissible scope of cross-examination.

### 3. Eliciting Testimony Regarding Gangs

Defense counsel limited defendant's penalty phase evidence to his childhood up to the age of 12, focusing on his educational challenges and his parents'

94

separation. In order to preclude the prosecutor from eliciting evidence outside this narrow scope, counsel did not present testimony about his good character traits during that time. Defendant contends the prosecutor nonetheless improperly questioned several witnesses about defendant's involvement in gangs during his childhood up to the age of 18.

We have reviewed the challenged questioning. The trial court sustained defense objections to several of the questions, and no objectionable evidence was presented to the jury. (*People v. Doolin* (2009) 45 Cal.4th 390, 444.) As to other questions, defense counsel made no objection and did not request an admonition. As to those questions, any claim of error has been forfeited on appeal. (*People v. Frye*, *supra*, 18 Cal.4th at pp. 969-970.)

In any event, we find no misconduct. Defendant's involvement with gangs was an established fact in the guilt phase. The prosecutor's questioning of the defense witnesses at the penalty phase regarding that subject was properly designed to show the witnesses lacked knowledge about defendant's life or were deliberately refusing to disclose their knowledge.

### 4. Questions Based on the Assumption Defendant was the Shooter

While cross-examining two of defendant's penalty phase witnesses, the prosecutor asked questions that assumed defendant was the shooter, such as "The fact that [defendant] killed Mark Walker is devastating to your family, isn't it?" Defendant contends it was improper for the prosecutor to pose this type of question because the jury had not made a specific finding that defendant was the shooter. The contention lacks merit. The record, including defendant's own admissions to being the shooter, supported the prosecutor's questions. Nothing more was required.

95

### 5. Questioning Defendant's Wife Regarding an Undisclosed Letter and Motion for Mistrial Based on Failure to Disclose the Letter

#### a. Background

During cross-examination of defendant's wife, the prosecutor produced and referred to a letter she ostensibly wrote to defendant after his arrest. The prosecutor asked, "Do you recall writing a letter to your husband in which you asked him to get you the names of the people involved in the prosecution so you could give them to somebody." Defense counsel's objection to this question as beyond the proper scope of cross-examination was overruled, and the wife answered, "No. I don't." Defense counsel asked to be shown the letter before further questioning. Outside the presence of the jury, the trial court discussed with the parties the fact that the letter had not been disclosed to the defense.

Defense counsel argued the failure to provide the letter as discovery violated the criminal discovery provisions of section 1054 et seq., and had impacted the defense's ability to make informed tactical decisions about what witnesses to call at the penalty phase. The prosecutor contended that, pursuant to section 190.3, he had no obligation to provide notice regarding the letter because it was penalty phase rebuttal evidence. Defendant moved for a mistrial and alternatively asked the court to admonish the jury not to infer anything from the questions asked about the letter. When the trial court said it would need to excuse the jury early that day to research the issue, the prosecutor chose to forgo the use of the letter. Defense counsel renewed his request for a mistrial because of the alleged impact already created by the mention of the letter, arguing its mention constituted intentional misconduct. The trial court denied the motion, stating it did not view the prosecutor's actions as intentional misconduct but rather as a disagreement as to the law concerning penalty phase rebuttal evidence. When the jurors returned to

96

the courtroom, the trial court admonished them to disregard the last question asked of the witness.

### b. Analysis

Defendant contends the prosecutor committed misconduct by violating his discovery obligation to disclose the letter to the defense if he intended to use it as rebuttal evidence at the penalty phase.  After defendant's 1996 trial, we addressed this issue in *People v. Gonzalez* (2006) 38 Cal.4th 932, 955-960 (*Gonzalez*), and held that, although penalty phase rebuttal evidence is not subject to section 190.3's notice requirement, it is subject to the criminal discovery provisions of section 1054 et seq.  Given the lack of guidance before *Gonzalez*, we agree with the trial court's ruling that the prosecutor's failure to disclose the letter did not represent intentional misconduct.

However, assuming for the sake of argument the prosecutor erred by not disclosing the letter, we find the error harmless beyond a reasonable doubt because the prosecutor withdrew his use of the letter, the trial court admonished the jury, and there was " 'no suggestion that the defense would have been different had defendant been aware of [the belated discovery] before trial.' "  (*Gonzalez*, *supra*, 38 Cal.4th at p. 962, quoting *People v. Pinholster* (1992) 1 Cal.4th 865, 941.)

Defendant contends the admonishment was insufficient because the court told the jury only to disregard the last question ("Is this your handwriting?"), rather than to disregard all mention of the letter.  Because defense counsel did not object when the court proposed the given admonition and later reminded the court to admonish the jury "to disregard the last question," defendant forfeited this claim on appeal.  In any event, the admonition was sufficient.  Defendant's wife had denied writing the letter in the only question she answered concerning it.  With the jury admonished to disregard the last pending question concerning whether the

97

letter was in her handwriting, there remained nothing in evidence about the letter for the jury to consider. We presume the jury followed the trial court's instructions. (*People v. Yeoman* (2003) 31 Cal.4th 93, 138-139; see *Francis v. Franklin* (1985) 471 U.S. 307, 324, fn. 9.)

For the same reasons, we reject defendant's claim that the trial court erred by denying his motion for mistrial based on the prosecutor's failure to disclose the letter. A motion for " 'mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction.' " (*People v. Jenkins* (2000) 22 Cal.4th 900, 985-986.) Here, where the jury was properly admonished, we find no abuse of discretion in the trial court's denial of the mistrial motion. (*People v. Cox*, *supra*, 30 Cal.4th at p. 953.)

### 6. Asserted Misconduct in Closing Argument

#### a. Asking Jurors to Put Themselves in the Victim's Place

Defendant contends the prosecutor committed misconduct by asking jurors to put themselves in the victim's place and imagining his final hour. Defendant forfeited this claim by failing to object and request an admonition in the trial court. (*People v. Frye*, *supra*, 18 Cal.4th at pp. 969-970.) In any event, "it is proper at the penalty phase for a prosecutor to invite the jurors to put themselves in the place of the victims and imagine their suffering." (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1212 [listing cases].)

#### b. Asking Jurors to Show Defendant the Same Mercy He Showed the Victim

Defendant contends the prosecutor committed misconduct by asking the jurors to show defendant the same level of mercy he showed the victim, which was none. Defendant forfeited this claim below by failing to object and request an admonition. (*People v. Frye*, *supra*, 18 Cal.4th at pp. 969-970.) In any event, defendant acknowledges our prior holdings that such comments are not

98

misconduct. (*People v. Benavides* (2005) 35 Cal.4th 69, 109; *People v. Ochoa* (1998) 19 Cal.4th, 353, 464-465.) We decline his request to reconsider the issue.

### c. Appealing to Jurors' Personal Fears and Insinuating the Jurors were Victims in the Case

Defendant contends the prosecutor committed misconduct by arguing the jurors were victims because hearing about defendant's acts would haunt them. Defendant forfeited this claim below by failing to object and request an admonition. (*People v. Frye*, *supra*, 18 Cal.4th at pp. 969-970.) In any event, the claim fails. Defendant points to *People v. Mendoza* (2007) 42 Cal.4th 686, 706, where we agreed with the trial court's ruling that a prosecutor committed misconduct by arguing jurors were victims in the sense they were forced to make a decision whether the defendant would live or die. However, the prosecutor's comments in the present case did not implicate the jury's duty to render a penalty phase verdict, but, rather, constituted a proper emotional appeal based on the evidence. (See *People v. Sanders* (1995) 11 Cal.4th 475, 551.)

### d. Arguing the Legal System Provided Defendant with More Rights Than the Victim Had

Defendant contends the prosecutor committed misconduct by implying the system coddles criminals by providing them more procedural protections than their victims. Defendant forfeited this claim below by failing to object and request an admonition. (*People v. Frye*, *supra*, 18 Cal.4th at pp. 969-970.) In any event, we reject defendant's interpretation of the prosecutor's comments. The prosecutor said defendant had "summarily executed" Walker even though Walker had committed no crime. The prosecutor contrasted this with the fact defendant now had defense counsel pleading for his life, and a jury considering his sentence. We find no misconduct in his remarks. The prosecutor properly contrasted the unlawful and arbitrary manner in which defendant had killed his victim with the

99

lawful and methodical way in which the legal system and the jury would decide defendant's fate.

### e. Name-calling and Dehumanizing Defendant

Defendant contends the prosecutor committed misconduct by referring to defendant as a "monster," a "sociopath," a "reprehensible excuse for a human being," and an "urban terrorist." Defendant forfeited these claims below by failing to object and request admonition. (*People v. Frye*, *supra*, 18 Cal.4th at pp. 969-970.) In any event, we reject this claim on its merits because "[a]rgument may include opprobrious epithets warranted by the evidence." (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1172.)

### f. Asserted Transformation of Mitigating Evidence into an Aggravating Factor

Defendant contends the prosecutor committed misconduct by commenting on defense mitigating evidence focusing on defendant's childhood and his alleged development disabilities. The prosecutor asked the jurors, as they considered testimony by defendant's family members, to consider that those family members "have been victimized by his conduct, by his crime. He has totally . . . spat in their faces, when he committed the murder. . . . He has rejected his upbringing. He came from a good American family."

Defendant contends the prosecutor's comments constituted error under *People v. Boyd* (1985) 38 Cal.3d 762, because mitigating evidence about his character and background was wrongly used as aggravating evidence. Defendant forfeited this claim below by failing to object and request an admonition. (*People v. Frye*, *supra*, 18 Cal.4th at pp. 969-970.) In any event, there was no misconduct. "*Boyd* concerns the *admission* of aggravating and mitigating *evidence*, not the scope of permissible argument." (*People v. Avena* (1996) 13 Cal.4th 394, 439.) The focus of the prosecutor's argument was that testimony by defendant's family

100

did not support a life sentence based on sympathy for that family when weighed against defendant's actions in committing the crimes.  " ' "A prosecutor does not mischaracterize such evidence [offered in mitigation] by arguing it should not carry any extenuating weight when evaluated in a broader factual context." ' " (*People v. Young* (2005) 34 Cal.4th 1149, 1219-1220.)

### g.  Appeals to the Conscience of the Community

Defendant contends the prosecutor committed misconduct by urging the jury to consider community values and to act as the conscience of the community.  Defense counsel unsuccessfully objected to the prosecutor's comments during the trial.  Defendant acknowledges we have rejected this type of claim in *People v. Zambrano*, *supra*, 41 Cal.4th at pages 1177-1178.  We decline his request to reconsider the issue.

### h.  References to Future Dangerousness

Based on the evidence of the shank found in defendant's cell, the prosecutor argued defendant would pose a danger to guards and other inmates if given a life sentence.  Defense counsel objected three times to this line of argument; one objection was sustained with an admonition to the jury to disregard the prosecutor's comment on future dangerousness.  Defendant acknowledges we repeatedly have held that when supported by the evidence, a prosecutor may argue in the penalty phase that if the defendant is not executed, he or she will remain a danger to others.  (*People v. Zambrano*, *supra*, 41 Cal.4th at p. 1179; *People v. Demetrulias* (2006) 39 Cal.4th 1, 32-33.)

### i.  Comments on Defendant's Lack of Remorse

Defendant contends the prosecutor committed misconduct by arguing defendant showed no remorse in the way he committed the murder and acted thereafter, and by observing that none of the defense witnesses testified that

defendant had expressed remorse for the crime. Defendant forfeited these claims below by failing to object and request an admonition. (*People v. Frye*, *supra*, 18 Cal.4th at pp. 969-970.) In any event, these claims lack merit.

The prosecutor properly commented on the cold-blooded manner in which defendant gunned down the victim and on defendant's conduct immediately after he left the murder scene and reappeared at Varela's party. A prosecutor may urge the jury to view a defendant's callousness of acts and lack of remorse at or near the time of the murder as aggravating circumstances of the capital crime. (§ 190.3, factor (a); *People v. Pollock*, *supra*, 32 Cal.4th at p. 1184; *People v. Crew* (2003) 31 Cal.4th 822, 857; *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1231-1232.) The prosecutor also properly could argue that defendant bragged that he "earn[ed] his stripes," by killing Walker. Defendant's comment about "earning his stripes" revealed that he had committed the murder to gain membership in a criminal gang, a motivation that could be considered in aggravation as a circumstance of the capital crime under section 190.3, factor (a).

Defendant is correct that the lack of testimony or evidence of postcrime remorse " 'does not fit within any statutory sentencing factor, and thus should not be urged as aggravating.' " (*People v. Pollock*, *supra*, 32 Cal.4th at p. 1184.) Defendant presented no evidence of postcrime remorse, and the prosecutor commented that, although the defense had called several witnesses, it had not put on any evidence or testimony "that defendant has expressed remorse, sorrow, sympathy, or pity." Here, where the prosecutor did not suggest that lack of remorse was an aggravating factor, he properly commented on defendant's lack of remorse "as relevant to the question of whether remorse is present as a mitigating circumstance." (*People v. Mendoza* (2000) 24 Cal.4th 130, 187; *People v. Davis* (1995) 10 Cal.4th 463, 537.)

102

*j. Reference to Defendant's In-Court Lack of Remorse*

Defendant contends the prosecutor committed misconduct by commenting on his in-court demeanor as evidencing a "lack of remorse or compassion." With regard to defendant's demeanor at trial, the prosecutor told the jury, "The only time [defendant] cried [was] when his mother talked about his parents splitting up. You saw the video of Mark Walker's family. You saw the testimony, you heard the testimony of Mark Walker's family. No tear was shed except when you bring up something that is a bad memory for him." Defendant forfeited this claim by failing to object and request admonition below. (*People v. Frye*, *supra*, 18 Cal.4th at pp. 969-970.)

We also reject this claim on the merits. At the penalty phase, " 'a prosecutor may comment during closing argument on a defendant's demeanor.' " (*People v. Valencia* (2008) 43 Cal.4th 268, 307, quoting *People v. Navarette* (2003) 30 Cal.4th 458, 516; see *People v. Haskett* (1990) 52 Cal.3d 210, 247 ["Reference to courtroom demeanor is not improper during the penalty phase."].)

*7. Cumulative Effect of Penalty Phase Misconduct*

Defendant contends the cumulative effect of the prosecutor's asserted misconduct at the penalty phase requires reversal of his death sentence even if none of the asserted misconduct is prejudicial individually. We have found no reversible error or prejudicial misconduct in the individual claims, and find no reversible error in the claims considered cumulatively, either.

**C. Instructional Issues**

*1. Refusal of Defense Instruction on Exclusivity of List of Aggravating Factors and Failure of Trial Court to Instruct on Issue on Its Own Motion*

Defendant's claim to the contrary, the trial court did not err by refusing to give a proposed defense instruction that stated the factors in aggravation referred

to in CALJIC No. 8.85 were the only ones the law permitted the jury to consider. Refusal to give this instruction was not error because what was expressed in the proposed special instruction was implicit in CALJIC No. 8.85, the instruction actually given.  (*People v. Berryman* (1993) 6 Cal.4th 1048, 1100.)

Repeating his previous argument that the prosecutor improperly referred to lack of remorse as an aggravating factor, defendant contends that, even if the trial court properly refused the proposed special instruction, it should have given an ameliorating instruction on its own motion after the prosecutor referred to defendant's lack of remorse in argument.  Because we have found the prosecutor's comments on lack of remorse were proper, we conclude the trial court had no reason to provide any type of ameliorative instruction on that issue.

### 2.  *Refusal of Defense Instruction Against Double Counting*

The trial court refused to give the defense's requested special instruction against "double counting" the crimes and the special circumstances.  As defendant acknowledges, " '[w]e have already concluded that the standard instructions do not inherently encourage the double counting of aggravating factors. [Citations.] We have also recognized repeatedly that the absence of an instruction cautioning against double counting does not warrant reversal in the absence of any misleading argument by the prosecutor.' "  (*People v. Ayala* (2000) 24 Cal.4th 243, 289, quoting *People v. Barnett* (1998) 17 Cal.4th 1044, 1180.)  Defendant acknowledges the prosecutor did not urge the jury to double count the circumstances of the crime and the special circumstances, and did not argue that each separate special circumstance should be considered a separate aggravating circumstance.  We therefore reject defendant's claim of error.

### 3. Refusal to Instruct on Entitlement of Defendant to Individual Judgment of the Jurors

At the guilt phase, the trial court instructed with CALJIC No. 17.40, which explained that each party was entitled to the individual opinion of each juror and that a juror should not be influenced to decide a question in a particular way because a group of jurors favored such a decision. At the penalty phase, the court refused defendant's proposed penalty phase instruction that essentially said the same thing as CALJIC No. 17.40. Although the court, in its penalty phase instructions, directed the jury to disregard the instructions given at the guilt phase, we reject defendant's contention that it erred by refusing his special instruction or by failing to repeat CALJIC No. 17.40. We have held the instructions that were given, CALJIC Nos. 8.84.1 and 8.84.2, instruct the penalty phase jury to give the defendant the benefit of a fully individualized evaluation of the aggravating and mitigating evidence presented. (*People v. Hawthorne* (1992) 4 Cal.4th 43, 74-75.) Nothing more was required.

### D. Juror Misconduct

After the jury returned its verdict of death, defendant filed a new trial motion alleging that Alternate Juror No. 3, who had been substituted in as a sitting juror at the outset of the penalty phase, had committed misconduct during voir dire by consulting an elder in his church about the church's views on capital punishment. The juror also read passages from the Book of Mormon to which the elder had referred him. The trial court denied the new trial motion, finding the juror had not committed misconduct, and that no prejudice resulted assuming misconduct had occurred. Defendant renews this claim of juror misconduct.

### 1. Background

In his motion for new trial, defendant submitted transcripts of two interviews with Alternate Juror No. 3 that revealed the following: Between the time

Alternate Juror No. 3 filled out his initial juror questionnaire and when he was questioned individually in chambers, he had consulted with his work supervisor, who was a friend and fellow elder of the Church of Jesus Christ of Latter-day Saints.[29]  Alternate Juror No. 3 asked about the church's general position on capital punishment because he did not know it when he filled out the juror questionnaire.  In that questionnaire, the juror said he had no opinion on the subject.  The friend advised him to read certain passages in the Book of Mormon that indicated church members should follow the laws of the state even if they did not believe in them.  The passages indicated to Alternate Juror No. 3 that if the laws of the state turned out to be wrong, this "would be sorted out in the end," and the church member "wouldn't be held accountable for it."  During voir dire, the prosecutor asked whether Alternate Juror No. 3 had formed an opinion about the death penalty since his initial juror questionnaire and whether he had the ability to actually impose the death penalty if he thought it was appropriate.  Based on his review of the scriptures, Alternate Juror No. 3 recalls he answered, that "the way my religion is . . . we are to obey the laws of the land that we're governed by, and that, yes, I would not have a problem if I had to do it."[30]

---

[29]  Defendant contends that, in the first interview, Alternate Juror No. 3 stated he had consulted his friend at the beginning of the penalty phase when he was substituted in as a sitting juror.  The passage defendant cites from the first interview is unclear, and does not support defendant's contention.  In any event, Alternate Juror No. 3 was clear in his second interview that he consulted his friend between the time he filled out his initial juror questionnaire and his in-chambers voir dire, and this was the chronology trial counsel adopted in arguing the new trial motion.

[30]  Alternate Juror No. 3's account accurately tracks his answer in the trial transcript:  "[W]ith my religion that's one of the things I believe is obey pretty much the laws of the land . . . .  And if that's what the law states should be imposed, that's pretty much what I would try to do, the best I could."

## 2. *Analysis*

"It is misconduct for a juror to consider material [citation] extraneous to the record. [Citations.] Such conduct creates a presumption of prejudice that may be rebutted by a showing that no prejudice actually occurred." (*People v. Mincey* (1992) 2 Cal.4th 408, 467.) "[T]he extraneous material to which jurors are exposed must be inherently likely to prejudice a juror, or there must be facts from which it can be concluded that there was substantial likelihood of actual bias." (*People v. Williams* (2006) 40 Cal.4th 287, 336.) Defendant contends the passages from the Book of Mormon that Alternate Juror No. 3 consulted were prejudicial because they impermissibly lessened his personal sense of responsibility by suggesting he would not be held accountable by his church for following the laws of the state.

Alternate Juror No. 3 tried to clarify his personal attitude towards the death penalty during the voir dire process by making a general query to his friend about his church's position on capital punishment, but he did not discuss any specifics of the case. Assuming for the sake of argument the juror committed misconduct by consulting passages from the Book of Mormon, those passages did not lessen the juror's personal sense of responsibility by shifting the decision to some other entity. Defendant's reliance on *Caldwell v. Mississippi* (1984) 472 U.S. 320, 325-326, is misplaced. In that case, the prosecutor argued the jury should not view itself as the final determiner of defendant's sentence because it would be reviewed by the state supreme court. (*Id*. at pp. 328-329.) Here, the passages from the Book of Mormon were neutral as to the death penalty. The effect they had, if any, was simply to take this juror's religion off the table as a factor in reaching a verdict at the penalty phase.

107

### E. Cumulative Error

Defendant contends the cumulative effect of the asserted guilt and penalty phase errors require reversal of his conviction and death sentence even if none of the errors is prejudicial individually.  We conclude any errors or assumed errors were not prejudicial, whether viewed separately or cumulatively.

### F. Death Sentence Disproportionate to Defendant's Individual Culpability

Defendant contends imposition of the death penalty is disproportionate to his individual culpability and violates the Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution.  Defendant requests we undertake intracase proportionality review in which we examine " 'the personal characteristics of the defendant, including age, prior criminality, and mental capabilities,' " and " 'the circumstances of the offense, including its motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts.' " (*People v. Steele* (2002) 27 Cal.4th 1230, 1269.)  " 'If the court concludes that the penalty imposed is "grossly disproportionate to the defendant's individual culpability" [citation], or, stated another way, that the punishment " ' "shocks the conscience and offends fundamental notions of human dignity" ' " [citation], the court must invalidate the sentence as unconstitutional.' " (*Ibid.*)

Defendant argues he was young at the time of the capital offense, he had limited mental capabilities, and had a minimal criminal background.  He also contends the jury never found he killed anyone or he intended anyone to be killed.

Defendant acknowledges the trial court did not determine the extent of his asserted mental impairment and, as a result, those factual questions can be determined only in a habeas corpus petition.  (*People v. Leonard*, *supra*, 40 Cal.4th at p. 1428.)

The lack of a specific jury finding that defendant was the shooter or that he intended to kill does not render his death sentence grossly disproportionate. Several witnesses testified to defendant's admissions that he was the shooter and that he intentionally shot the victim to prevent him from identifying defendant and his codefendants. Furthermore, in order to find true the special circumstance of murder in the commission of a robbery or in the commission of a kidnapping for robbery or in the commission of a kidnapping, the jury had to find either that "defendant actually killed a human being" or that he "with the intent to kill," or "with reckless indifference to human life and as a major participant," aided and abetted the felonies that supported the theory of first degree felony murder in this case. (CALJIC No. 8.80.1 (1996 rev.) (5th ed. 1988).)

While defendant, who was 20 at the time of the capital offense, arguably was young and lacked an extensive prior criminal history, the circumstances of the crime were heinous. Defendant participated in carjacking the 16-year-old victim, apparently motivated by the desire to obtain transportation to a party. Defendant kidnapped the teenager by imprisoning him in the trunk of his family's car, drove to the party, and eventually drove the victim to an isolated location. The evidence reasonably suggests defendant shot the defenseless teenager at close range as he tried to get out of the trunk. Defendant returned to the party and remorselessly carried on as if nothing had happened. Defendant later bragged to several witnesses about committing the murder. We conclude defendant's death sentence is not grossly disproportionate and is justified by his motive, the extent to which he was involved in the crime, the manner in which the crime was committed, his remorseless attitude about the crime, and the consequences of his acts.

## VI. SENTENCING ISSUES

### A. Request to Modify Sentence in Lieu of Penalty Retrial

Defendant requests that, if we vacate his death sentence, we should order a sentence of life without the possibility of parole pursuant to sections 1181, paragraph 7, and 1260, rather than remanding his case for a new penalty trial. Because we find no reversible error and do not vacate the death sentence, we do not address this request or whether, in the event of reversible error, the cited statutes permit us to modify a death sentence rather than remand for a new penalty phase trial. (See *People v. Hines* (1997) 15 Cal.4th 997, 1081-1084 (conc. opn. of Mosk, J).)

### B. Reversal of Conviction for Count III, Carjacking, as a Necessarily Included Offense of Kidnap for Carjacking

Defendant was convicted of both count II, kidnap during a carjacking (§ 209.5) and count III, carjacking (§ 215). For count III, the principal determinate term, the trial court imposed the upper term of nine years with one year additional for the section 12022, subdivision (a)(1) firearm enhancement. For count II, the court sentenced him to a concurrent sentence of life with the possibility of parole, with one year additional for the section 12022, subdivision (a)(1) firearm enhancement. The People correctly concede carjacking is a necessarily lesser included offense of kidnap for carjacking. (*People v. Ortiz* (2002) 101 Cal.App.4th 410, 415; *People v. Contreras* (1997) 55 Cal.App.4th 760, 765.) Defendant's conviction and sentence for count III and the attendant enhancement are reversed. (*People v. Contreras, supra*, 55 Cal.App.4th at p. 765.)

### C. Section 654 Requires Staying of Sentence for Count II

Section 654 provides that the same act or omission shall not be punished under more than one provision of law. Although the trial court made a finding that section 654 applied, it sentenced defendant to concurrent terms on all four counts,

including count II (kidnap during a carjacking) and count III (carjacking), the predicate felonies for the finding of first degree murder on a theory of felony murder. As the People properly concede, felony murder was the sole theory of murder under which the case was prosecuted, and section 654 precludes imposition of separate terms for these two felonies because they are the predicate felonies for the theory of felony murder, for which defendant received his first degree murder sentence of death. (See *People v. Boyd* (1990) 222 Cal.App.3d 541, 575-576.) Concurrent terms are precluded by section 654 (*People v. Miller* (1977) 18 Cal.3d 873, 887), including the one-year firearm sentence enhancements attached to each count (*People v. Bracamonte* (2003) 106 Cal.App.4th 704, 709). As discussed above, count III is reversed. We order the sentence imposed as to count II be stayed.

## VII. MISCELLANEOUS CHALLENGES TO THE DEATH PENALTY

Defendant raises various challenges to California's death penalty law. We affirm the decisions that have rejected similar claims and decline to reconsider them, as follows:

Section 190.2, which sets out the special circumstances that if found true render a defendant eligible for the death penalty, adequately narrows the category of death-eligible defendants in conformity with the requirements of the federal constitution. (*People v. Hoyos* (2007) 41 Cal.4th 872, 926.)

Section 190.3, factor (a), which allows the jury to consider the "circumstances of the crime" as an aggravating factor, is neither vague nor overbroad, and does not impermissibly permit arbitrary and capricious imposition of the death penalty. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 333.)

The jury need not make written findings, achieve unanimity as to specific aggravating circumstances, find beyond a reasonable doubt that an aggravating

111

circumstance is proved (except for § 190.3, factors (b) and (c)), find beyond a reasonable doubt that aggravating circumstances outweigh mitigating circumstances, or find beyond a reasonable doubt that death is the appropriate penalty.  (*People v. Williams* (2010) 49 Cal.4th 405, 459; *People v. Morrison*, *supra*, 34 Cal.4th at pp. 730-731.)  Moreover, the jury need not be instructed as to any burden of proof in selecting the penalty to be imposed.  (*People v. Burgener*, *supra*, 29 Cal.4th at p. 885.)  The United States Supreme Court's decisions interpreting the United States Constitution Sixth Amendment's jury trial guarantee (*Cunningham v. California* (2007) 549 U.S. 270; *United States v. Booker* (2005) 543 U.S. 220; *Blakely v. Washington* (2004) 542 U.S. 296; *Ring v. Arizona* (2002) 536 U.S. 584; *Apprendi v. New Jersey* (2000) 530 U.S. 466) have not altered our conclusions in this regard.  (*People v. Salcido* (2008) 44 Cal.4th 93, 167; *People v. Hoyos*, *supra*, 41 Cal.4th at p. 926.)

The absence of intercase proportionality review does not violate the Eighth and Fourteenth Amendments to the United States Constitution.  (*People v. Thompson* (2010) 49 Cal.4th 79, 143.)

The jury may properly consider evidence of unadjudicated criminal activity under section 190.3, factor (b).  (*People v. Friend* (2009) 47 Cal.4th 1, 90.)

"The use of certain adjectives such as 'extreme' and 'substantial' in the list of mitigating factors in section 190.3 does not render the statute unconstitutional." (*People v. Thompson*, *supra*, 49 Cal.4th at p. 144, citing *People v. Prieto*, *supra*, 30 Cal.4th at p. 276.)

"[T]he jury need not be instructed as to which sentencing factors are aggravating and which are mitigating."  (*People v. Samayoa* (1997) 15 Cal.4th 795, 862.)

"California's capital sentencing procedures do not violate principles of equal protection of the law on the ground that they provide safeguards different from

112

those found in noncapital cases." (*People v. Williams*, *supra*, 43 Cal.4th at p. 650.)

"International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements." (*People v. Friend*, *supra*, 47 Cal.4th at p. 90.)

## VIII. CONCLUSION AND DISPOSITION

Count III, carjacking (§ 215), is reversed, and the sentence imposed as to count II, kidnapping during the commission of a carjacking (§ 209.5), is stayed. The superior court is directed to amend the abstract of judgment to reflect these modifications and to forward the amended abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed, including the death sentence.

CHIN, J.


WE CONCUR:

CANTIL-SAKAUYE, C. J.
KENNARD, J.
BAXTER, J.
WERDEGAR, J.
CORRIGAN, J.
LIU, J.

113

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Montes

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S059912
**Date Filed:** March 13, 2014

_____

**Court:** Superior
**County:** Riverside
**Judge:** Robert J. McIntyre


_____

**Counsel:**

Sharon Fleming, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Annie Featherman Fraser and Bradley A. Weinreb, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Sharon Fleming
P.O. Box 157
Ben Lomond, CA  95005
(831) 336-5920

Bradley A. Weinreb
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2290